[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14488

_____

D.C. Docket No. 1:15-cv-00769-SCJ

BELINDA MARTIN,

Plaintiff-Appellant,

versus

FINANCIAL ASSET MANAGEMENT SYSTEMS, INC.,
JERRY HOGAN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 14, 2020)

Before JORDAN, GRANT, and SILER,* Circuit Judges.

GRANT, Circuit Judge:

_____

* Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting
by designation.

Belinda Martin's last day at work was a very bad one.  After a contentious staff meeting where she was targeted by her boss, Martin sought out her company's human resources director.  The content of that discussion is disputed; Martin says she claimed race- and sex-based discrimination, while the HR director says she did not.  What we know with certainty is that she was fired two days later, and then sued under a number of civil rights laws.  Her FMLA claim is easy to dispose of because it asks us to do the impossible—rewrite the statute based on her own ideas of equity.  Her Title VII retaliation claim is more difficult; the timing of her firing naturally raised Martin's suspicions.  The problem is that we do not have evidence—any evidence—that Martin's boss knew about her discrimination complaints before he fired her.  Retaliation is impossible without something to retaliate against.  Because speculation about her boss's knowledge cannot make up for the missing evidence, we affirm.

## I.

## A.

Martin began working at Financial Asset Management Systems, Inc.—a debt-collection agency based in Georgia—as an Operations Manager in 2009.  Throughout her tenure, Martin was supervised by the company's President and CEO, Jerry Hogan, who promoted her to Director of Operations in 2010.

But things were not as smooth as they seemed.  In October 2012, Martin filed a complaint with the EEOC alleging that Hogan and the company discriminated against her based on race and sex.  According to Martin, Hogan would "scream profanities," "kick chairs, throw bottles, and bang on the table"

during her feedback sessions—but did not behave that way toward some of her white male coworkers. In December of that year, Martin, Hogan, and the company entered into mediation at the EEOC and settled the charge.

Roughly sixteen months later, on February 26, 2014, Martin participated in an executive staff meeting with Hogan and several of their colleagues. During the meeting, according to Martin, Hogan "screamed, yelled, [and] belittled [her] in front of [her] peers for the thousandth time in reference to nothing." She left the meeting crying, and emailed the company's VP of human resources, Lida Bayne, asking to talk.

Around the same time, Hogan repeatedly called Martin's office to discuss what had happened during the executive staff meeting, but Martin did not pick up (although she was in her office). Soon after, Bayne arrived at Martin's office, at which point Martin told her that she "wanted to file a complaint on Jerry Hogan." Martin explained that she "felt like being a black female, he targets me," whereas he "does not target Barry Brown," a white male.[1] She also complained that Hogan "preferred Kevin," another white male, even though his "performance wasn't as good" as hers. Martin told Bayne that she "needed to go take care of [her] health" and would take at least two days off.

---

[1] Bayne testified that Martin complained about being treated differently than two coworkers, but she maintained that Martin never specifically mentioned race or sex. Bayne's account is corroborated by a contemporaneous email she sent to herself memorializing the conversation. Of course, in considering the company's motion for summary judgment, we resolve any factual disputes in favor of Martin, who insists that she did reference race and sex.

3

Bayne emailed Hogan the next day to inform him that Martin had sought her out and "was going to take some time off to think through the best way to take care of herself." The email also explained that Martin "was visibly upset," and that she "talked about her frustration with what she perceived as being targeted for criticism."

Either that same day or the next, Bayne met with Hogan in person to discuss Martin. According to Bayne, Hogan "launched into" his "ongoing frustration" with Martin. But both deny ever discussing Martin's alleged complaints about race or sex discrimination. Hogan claims that during this meeting he decided to fire Martin for refusing to answer his calls following their executive staff meeting: "I believe my response was she can have two days off because I'm done. I've had enough. I'm terminating her employment because she would not answer my call." To that end, Hogan signed a termination letter and mailed it to Martin—two days after Martin's meeting with Bayne in which she allegedly complained about discrimination.

Meanwhile, Martin met with Shaketa Bruce, a licensed professional counselor on a list provided by her health insurance company. Bruce's clinical impression was that although Martin suffered from an "[a]djustment disorder with depressed mood and anxiety," her appearance, manner, ability to communicate, and thought content were all within normal limits. Bruce recommended that Martin follow up with a physician, but never told her not to work or determined that she was incapable of working.

B.

Martin sued the company and Hogan for interference and retaliation under the FMLA, and for retaliation under Title VII and § 1981.[2]  Following extensive discovery, both defendants moved for summary judgment on all claims, and the district court granted their motion.  The district court concluded that Martin's FMLA claims could not succeed because Bruce—a licensed professional *counselor*—did not qualify as a "health care provider" under the statute.  The district court also concluded that Martin could not establish a prima facie case of retaliation under Title VII or § 1981.  Specifically, the court found that—without evidence that Hogan knew Martin had complained of race and sex discrimination—she could not draw a connection between her firing and her claims of discrimination.

II.

"We review the district court's grant of summary judgment *de novo*." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 795 (11th Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine

---

[2] Because Martin failed to discuss her § 1981 claim on appeal, she abandoned it.  *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).  But since the same elements are required to prove a claim of retaliation under Title VII or § 1981, Martin's § 1981 claim would have failed for the same reasons her Title VII claim fails.  *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018) (stating that section 1981 and Title VII claims of discrimination and retaliation are analyzed under the same legal framework); section III.B, *infra* (discussing Martin's Title VII claim).  We also affirm the district court's grant of summary judgment in favor of Hogan on Martin's Title VII claim, given that "relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act." *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006).

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.

## A.

We first consider Martin's FMLA claim.  The FMLA provides a right to medical leave "[b]ecause of a serious health condition."  29 U.S.C. § 2612(a)(1)(D).  And it prohibits employers from interfering with "the exercise of or the attempt to exercise" that right.  *Id.* § 2615(a)(1).  Although this provision does not expressly speak in terms of retaliation, we have held that it also "prohibits an employer from retaliating against an employee who attempts to exercise any FMLA-created right."  *Walker v. Elmore Cty. Bd. of Educ.*, 379 F.3d 1249, 1250 (11th Cir. 2004).  In plain English, "an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute."  *Brungart*, 231 F.3d at 798 n.5.  Here, Martin claims that her employment was terminated "to interfere with [her] use of FMLA, to prevent other employees from seeking FMLA leave, and to prevent [her] from engaging in future use of FMLA leave."

We have rejected the argument that "the FMLA protects a request for FMLA leave regardless of whether the employee would be eligible for the leave."  *Walker*, 379 F.3d at 1253.  So to state a claim for interference or retaliation, the plaintiff must have been eligible for the leave that she sought, which, as relevant here, means showing that she suffered from a serious health condition.  *See Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003) ("Interference and

6

retaliation claims both require the employee to establish a 'serious health condition.'"); *see also Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) (plaintiff "failed to present evidence that she exercised a protected right under the FMLA" because she did not present evidence of a serious health condition).

The FMLA defines a "serious health condition" as one that involves "continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B). And it defines "health care provider" as a licensed "doctor of medicine or osteopathy" or "any other person determined by the Secretary [of Labor] to be capable of providing health care services." 29 U.S.C. § 2611(6). The relevant Department of Labor regulation lists several categories of individuals "capable of providing health care services," but the only one that could apply here is a catch-all provision encompassing "[a]ny health care provider from whom an employer or the employer's group health plan's benefits manager will accept certification of the existence of a serious health condition to substantiate a claim for benefits." 29 C.F.R. § 825.125(b)(4).

Martin contends that her visits with Bruce, her counselor, should count as treatment by a health care provider. But her former employer does not "accept certification of the existence of a serious health condition to substantiate a claim for benefits" from licensed professional counselors. *Id.* In fact, Martin herself concedes that "Bruce does not fall within the ambit of the statutory language." Even so, she "feels there is room for equity."

In Martin's view, we should count Bruce as a health care provider because "remedial statutes"—like the FMLA—should be "liberally construed." But while

7

Martin says she seeks a *liberal construction* of the statute, what she really wants is an *equitable revision*. And as we have explained, courts may not adopt a "liberal interpretation" of a statute when doing so would "expand the language of the statute beyond the intent of Congress as expressed through the words of the legislation." *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107, 1110 (11th Cir. 1993) (per curiam). Broad remedial goals are not an invitation to judicial craftsmanship. We therefore affirm the district court's grant of summary judgment with respect to Martin's FMLA claims.

## B.

We turn now to Martin's Title VII claim against the company. Title VII's antiretaliation provision prohibits employers from discriminating against an employee "because he has opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). To that end, employers cannot retaliate against employees who have complained about—that is, opposed—discrimination based on their race or sex. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 925 (11th Cir. 2018).[3]

As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression. *See Brungart*, 231 F.3d at 799. That awareness, like most issues of fact, can be established through circumstantial evidence—but not by unsupported inference. *See id.* In short, if Hogan did not know about Martin's

---

[3] This Court has also held that § 1981 prohibits employers from retaliating against employees for complaining about race discrimination. *See Bryant v. Jones*, 575 F.3d 1281, 1309 (11th Cir. 2009).

discrimination complaints, he could not have fired her because of them.  As we said in *Clover v. Total System Services, Inc.*, which governs this case, a jury finding that a decisionmaker was aware of an employee's protected conduct "must be supported by reasonable inferences from the evidence, not mere speculation." 176 F.3d 1346, 1355 (11th Cir. 1999).

1.

We agree with the district court that Martin fell short on the knowledge front: because she did not offer any evidence that Hogan knew she had complained about race or sex discrimination, she cannot show a relationship between her firing and that protected activity.  Hogan says he had no idea that Martin complained to HR Vice President Bayne of discrimination.  To be sure, he admits knowing that Martin was unhappy—very unhappy—about his emotional outbursts and other unprofessional treatment of her, but he testified that no one told him about her complaints of race- and sex-based discrimination.  That testimony was corroborated by Bayne, who denied telling Hogan that Martin filed a discrimination complaint after he lashed out at her during the meeting.  Bayne says that her meeting with Hogan did not cover "any of the details" of her discussion with Martin.  Instead, she listened to Hogan's complaints.  What's more, Bayne's detailed contemporaneous notes of her discussion with Martin are devoid of any indication that Bayne understood Martin to be making a discrimination complaint. Thus, even crediting Martin's testimony—as we must and as we do—that she

9

complained of race and sex discrimination to Bayne, there is no evidence that Bayne understood it that way or that she passed those complaints on to Hogan.[4]

Martin counters that Hogan must have known.  Her strongest evidence is that Hogan fired her only two days after she complained to Bayne about race and sex discrimination.  That close connection in time, she says, is enough to show that Hogan knew of her discrimination complaints and fired her because of them.  Generally, it is true that a plaintiff can demonstrate causation "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  To that end, "we have explained that an employee's termination within days . . . of his protected activity can be circumstantial evidence of a causal connection between the two." *Jefferson*, 891 F.3d at 926.

But "unrebutted evidence that the decision maker did not have knowledge" of the employee's protected conduct means that "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection." *Brungart*, 231 F.3d at 799.  After all, a "decision maker cannot have been motivated to retaliate by something unknown to him," whether or not the two events happened close in time. *Id.*

Here, the direct evidence shows only that Hogan was unaware that Martin said she had been discriminated against.  Temporal proximity is not enough to put

---

[4] According to Bayne and Hogan, their meeting was also attended by the company's Chief Financial Officer, Tim Farmer.  The record contains no evidence that Farmer was deposed regarding this meeting, so we have no way of knowing whether he would have corroborated or contradicted Bayne and Hogan's testimony about the meeting.

that in doubt, but our precedent still allows Martin to avoid summary judgment if she can present any other evidence of Hogan's knowledge. *See Brungart*, 231 F.3d at 799. Alternatively, Martin could present evidence that impeaches Hogan's denial of knowledge. *See id.* We now consider whether she has offered either.

2.

The first question is whether Martin has any evidence to rebut Hogan's denial of knowledge. Our decision in *Clover* guides our analysis. *See* 176 F.3d 1346. In *Clover*, a Title VII plaintiff claimed she was terminated because of her participation in a sexual harassment investigation. *Id.* at 1349–50. There, as here, the decisionmaker denied any knowledge of the plaintiff's protected conduct, even though the plaintiff presented evidence of a conversation between the decisionmaker and a senior HR official in the period between the plaintiff's protected conduct and her termination the very next day. *See id.* at 1354–55. Under those similar facts, we explained that it would be "pure speculation" to infer that the HR manager actually told the decisionmaker about the plaintiff's participation in the sexual harassment investigation. *Id.* at 1355. Evidence that the HR manager "could have told" is not the same thing as evidence that she "did tell." *Id.*

The same is true here—circumstantial evidence shows that Bayne had an opportunity to tell Hogan that Martin engaged in protected activity, but not that she actually did. The meeting between Bayne and Hogan is not itself evidence of Hogan's knowledge. Without more—and in the face of Bayne's unrebutted denial

11

that she told Hogan about Martin's discrimination complaint—evidence of Bayne's opportunity to tell is not a substitute for evidence that she did so.

Martin tries to give us more. She responds that even though she lacks any direct evidence that Bayne told Hogan about her protected activity, circumstantial evidence shows that Hogan somehow must have known.

*First*, Martin points to the company's Employee Handbook, which requires notifying alleged perpetrators of discrimination complaints. We think the policy is worth quoting in full:

> Any person receiving a report of discrimination or harassment shall immediately relay all pertinent information to the Director of Operations or the Human Resources Department in the form of a written report that has been reviewed for accuracy and signed by the reporter. The report shall then be transmitted to the individual in charge of Human Resources to begin an investigation. Before an investigation begins, the alleged perpetrator shall be informed of the nature of the report and attempt to resolve the situation consensually. If a consensual resolution cannot be reached within a reasonable time, the investigation and reporting procedures outlined below shall begin.

Read most naturally, this policy would have required three sequential events. "[I]mmediately" after Martin's complaint, Bayne would have needed to obtain or produce a "written report" that was signed by Martin.[5] Next, "[b]efore an investigation begins," Hogan would be informed of the nature of the complaint. Finally, Bayne would begin an investigation if the issue could not have been resolved "consensually."

---

[5] Note that Bayne is both the "person receiving a report of discrimination" and the director of human resources.

12

Martin asks us to conclude that the policy's second step—disclosure—was accomplished during Bayne and Hogan's meeting.  But we cannot make this inference on the basis of the company policy.  To begin with, there is no indication that Martin reviewed, let alone signed, any report.  Without a report, we cannot presume that a notification took place because, under the policy, "the alleged perpetrator shall be informed of the nature of the report."  Since any notification in the meeting would have been outside the policy, the policy itself does not move the needle.  Moreover, even if the policy had been followed, the most logical inference would be that Bayne's subsequent email to Hogan was the required notification.  But recall that this email only said that Martin complained about being "targeted for criticism" and did not mention race or sex.[6]

Quite simply, Martin's Employee Handbook argument requires us to conclude that Bayne complied with the notification requirement while disregarding the requirement to obtain Martin's review and signature.  We would also need to conclude that Bayne's email describing Martin's complaints (but omitting any mention of discrimination) was not the notification under the policy, and that some other written notification was made that did not surface during discovery.  These are not the "reasonable inferences" to which Martin is entitled at summary judgment.  *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018).  Absent any written notification of discrimination, we are again left with

---

[6] Respectfully, we do not think that the word "targeted" can bear the weight that the dissenting opinion puts on it.

Martin's hypothesized account of Bayne and Hogan's meeting, but as we have already said, speculation is not evidence.

*Second*, Martin urges that because Hogan knew about a discrimination complaint that she made in 2012, he must have concluded that her new complaint was also based on discrimination. We recognize the intuitive appeal of this argument. But a bare suspicion that Hogan may have guessed about Martin's claims is simply not legally sufficient. Martin's prior complaint of unlawful discrimination is not evidence that all subsequent workplace complaints must be related to unlawful discrimination, let alone evidence that Hogan would make that inference.

In *Maniccia v. Brown*, we found that the passage of 15 months between the plaintiff's grievance and an adverse employment action prevented an inference that the former caused the latter. *See* 171 F.3d 1364, 1370 (11th Cir. 1999), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). There, the lapse of time prevented the inference that an employee was terminated because she complained. Here, the question is whether we can conclude—despite a similar lapse of time—that the context of a prior complaint allowed the decisionmaker to ascertain the basis of a later complaint. In both cases, however, we find that the passage of time weakens the strength of the inference. If a 15-month gap makes the *Maniccia* plaintiff's reasoning too speculative, then the 16-month gap here makes the imputation of knowledge too speculative as well. Moreover, Martin has not claimed that she was fired because of her earlier complaint.

14

*Third*, Martin argues that even if Bayne did not directly mention discrimination, she may have said other things that put Hogan on notice.  But if the factfinder is not allowed to conclude, without evidence, that Bayne must have told Hogan about Martin's protected activity, neither can it decide that Bayne must have *hinted* at it.  The latter is no less speculative than the former.  All Martin is left with to show knowledge is temporal proximity, which is insufficient given Hogan's unimpeached testimony that he lacked knowledge.

3.

Having failed to show evidence of Hogan's knowledge, Martin argues that Hogan's testimony that he was not aware of her protected activity was impeached. Martin relies primarily on our decision in *Goldsmith v. City of Atmore*.  *See* 996 F.2d 1155 (11th Cir. 1993).  That plaintiff—a clerical worker in the city clerk's office—told a city councilman that she planned on filing a complaint of race discrimination with the EEOC.  *Id.* at 1163–64.  The councilman then met with the mayor, and only three weeks later, the mayor "abruptly" transferred the plaintiff to a different division.  *Id.* at 1163.  The plaintiff claimed that the mayor transferred her because she was going to file a complaint—but the mayor and councilman denied discussing the plaintiff's plans during their meeting.  *Id.* at 1163 n.12. Their denial, however, was not complete.  Instead, the mayor was "impeached by his prior deposition testimony in which he stated that he *may* have spoken with [the councilman] about [the plaintiff's] complaints."  *Id.* (emphasis added).  Given that, we saw "no error in the district court's decision to submit this disputed evidence to the trier of fact."  *Id.* at 1164 n.12.

15

The problem for Martin is that although she cites a "host of impeachment evidence," none of it is related to the only legally relevant question: whether Hogan knew of Martin's protected activity at the time he took adverse action against her. Martin leans most heavily on Hogan's inconsistent statements about the date he decided to fire her—he has said both February 26 and February 28. But a dispute about when Hogan decided to fire Martin is different than a dispute about Hogan's knowledge at the time of the firing. We have no evidence of knowledge on either date. And unlike in *Goldsmith*, we see no daylight between any of Hogan's statements about his knowledge.

To be sure, if Martin had any evidence that Hogan knew about her protected activity on one date and not the other, then the date that Hogan decided to fire Martin would be circumstantial evidence of why he decided to fire her. And that kind of evidence might be relevant at trial to prove that Hogan was motivated by a retaliatory purpose. But the question of whether a decisionmaker was even aware of protected activity necessarily comes before the question of whether he acted on it. *See Brungart*, 231 F.3d at 799. As we said in *Clover* and *Goldsmith*, the plaintiff must establish "that the employer was actually aware of the protected expression *at the time it took adverse employment action*." *Clover*, 176 F.3d at 1354 (quoting *Goldsmith*, 996 F.2d at 1163 (emphasis added)). Without any evidence of knowledge, the timing is just not relevant.

So—in the face of unrebutted evidence that Bayne did not tell Hogan that Martin alleged discrimination—it does not matter whether Hogan actually decided to fire Martin on February 28, after speaking with Bayne, rather than February 26,

16

before speaking with Bayne.  We have no evidence of knowledge either way.
Hogan and Bayne both testified that Hogan was never told that Martin complained
of discrimination; Martin cannot impeach this testimony by making a contest of
when Hogan privately decided to fire her.  Nor can she argue that if Hogan decided
to fire Martin only after meeting with Bayne, we can infer that Bayne must have
told Hogan that Martin complained of discrimination.  This would just be a round-
about way of arguing that we should infer knowledge based on temporal proximity.
But *Brungart* is clear: in the face of evidence that Hogan lacked knowledge, mere
temporal proximity between the protected activity and the adverse action cannot
support an inference of causation.  *See* 231 F.3d at 799.

4.

Pushing back on these conclusions, Martin argues that relying on Hogan's
denial of knowledge requires an impermissible credibility determination.  If our
review of the evidence boiled down to deciding a he-said, she-said dispute, Martin
would be right.  But that's not what this case is; we do not make any credibility
determinations at all.  Take the meeting between Martin and Bayne.  Each party
offers a different account: Martin says she invoked race and sex discrimination and
Bayne says she did not.  We credit Martin's account and presume for purposes of
summary judgment that she did complain of discrimination.  *See Fitzpatrick v. City
of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

Hogan's denial, by contrast, does not implicate Martin's credibility at all—
or anyone else's.  Hogan says that he did not even know about Martin's complaints
when he fired her, whereas Martin insists that he *must* have known—after all, he

17

talked to Bayne about Martin just days after Martin aired her grievances to Bayne. But by affirming the district court, we are not crediting Hogan's word over Martin's testimony; we are merely refusing to credit Martin's speculation as evidence. That refusal is dictated by *Clover* and follows from the usual principles that apply at summary judgment. Indeed, Martin did not testify that Bayne told Hogan about the nature of her complaints. How could she? She was not part of that conversation. Lacking even circumstantial evidence other than temporal proximity, we agree with the district court that a reasonable jury could not infer—rather than guess or assume—knowledge. At most, the record contains evidence that Bayne *could* have told Hogan about the nature of Martin's complaints. "But because 'could have told' is not the same as 'did tell,' it would be pure speculation to infer that [Bayne] actually told" him. *Clover*, 176 F.3d at 1355.

*Finally*, Martin suggests that we cannot affirm the district court's grant of summary judgment based on a *defendant's* testimony. A jury is always entitled to disbelieve the defendant, but that confuses the point. It is not Hogan's burden to show that he did not know about Martin's complaints; it is Martin's burden to set forth evidence suggesting that he did. *See id.* at 1354 ("[A] plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."). Put another way, summary judgment is not warranted because of what Hogan's testimony shows; it is warranted because of what the record, viewed in the light most favorable to Martin, fails to show.

18

\*    \*    \*

Unlawful discrimination is intolerable, and those who engage in it should be held to account. But inferences in favor of a plaintiff can be based only on evidence—not on speculation. Because a jury in this case could find discrimination only on the basis of the latter, summary judgment was appropriate.

IV.

In sum, Martin is not entitled to relief under the FMLA because she did not receive treatment from a "health care provider," as defined by the statute. Her § 1981 claims were abandoned on appeal. And because the company presented evidence that Hogan lacked knowledge of Martin's discrimination complaint, Martin had to either impeach Hogan's testimony or present circumstantial evidence of his knowledge beyond temporal proximity. She did neither, so our precedents compel summary judgment on her Title VII claim as well.

**AFFIRMED.**

JORDAN, Circuit Judge, concurring in part and dissenting in part.

For the reasons stated in the majority opinion, I agree that summary judgment was properly granted against Ms. Martin on her FMLA claims. I disagree, however, with the majority's conclusion that summary judgment was appropriate on Ms. Martin's Title VII retaliation claim.

We have explained that "[i]n order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that the protected activity and the adverse action were not wholly unrelated." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citations and internal quotation marks omitted). *See also Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985) ("We do not construe the 'causal link' . . . to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.").

To make this showing, "a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse

employment action." *Goldsmith*, 996 F.2d at 1163. This "may be established by circumstantial evidence." *Id*.

Of course, because we are reviewing the district court's grant of summary judgment, we must "consider all evidence and reasonable inferences drawn therefrom in a light most favorable to the non-moving party." *See Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008). In my view, Ms. Martin presented evidence from which a jury could reasonably infer that Mr. Hogan had knowledge of her discrimination complaint before he terminated her employment.

* * * * *

As set forth in the majority opinion, in October of 2012 Ms. Martin filed a complaint with the EEOC alleging that Mr. Hogan and FAMS discriminated against her based on race and sex. Mr. Hogan was aware of this complaint, as in December of 2012 he and FAMS entered into mediation at the EEOC and settled the charge.

About 16 months later, on February 26, 2014, Ms. Martin met with Ms. Bayne after a staff meeting where she felt that she was targeted by Mr. Hogan. Ms. Martin told Ms. Bayne that she wanted to file a complaint against Mr. Hogan because she "felt like being a black female, he targets me." D.E. 63-1 at 15:13–15.

The next day, Ms. Bayne sent an email to Mr. Hogan to inform him of Ms. Martin's concerns. In the email, Ms. Bayne stated that Ms. Martin "talked about her frustration with what she perceived as being *targeted* for criticism." D.E. 63-2 at 36

(emphasis added).  Ms. Bayne and Mr. Hogan also met in person to discuss Ms. Martin.  Both Ms. Bayne and Mr. Hogan deny discussing Ms. Martin's complaint about race and sex discrimination during that meeting.

On February 28, 2014—two days after Ms. Martin complained to Ms. Bayne about Mr. Hogan's treatment of her, and one day after Ms. Bayne sent the email to Mr. Hogan about Ms. Martin's concerns—Mr. Hogan fired Ms. Martin.

\* \* \* \* \*

Considering this evidence in the light most favorable to Ms. Martin, as we must, a reasonable jury could infer that Mr. Hogan was aware that she complained of race and/or gender discrimination prior to firing her.

I disagree with the majority that this case is governed by *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999).  In *Clover*, the plaintiff participated in a sexual harassment investigation.  *See id.* at 1349.  The plaintiff argued that the decisionmaker had knowledge of her participation in the investigation because he spoke to a senior HR official (who knew of the plaintiff's participation) prior to terminating the plaintiff.  *See id.* at 1354–55.  We held that the fact that the HR official "conceivably could have told" the decisionmaker about the plaintiff's participation in the investigation was not enough to permit an inference that he had knowledge.  *See id.* at 1355.

22

Here, in contrast, the key evidence is not that Ms. Bayne met with Mr. Hogan prior to his termination decision; indeed, we cannot speculate as to what was discussed during that meeting. The pertinent evidence is that Ms. Bayne sent an email to Mr. Hogan after her meeting with Ms. Martin, informing him that Ms. Martin complained that she was being "targeted" by him. Given the fact that Mr. Hogan knew that Ms. Martin had filed an EEOC charge against him for race and gender discrimination 16 months earlier, a reasonable jury could infer that he knew from this email that Ms. Martin had once again complained about him targeting her based on her race or gender. What else could Ms. Martin have meant when she said she was being "targeted" by Mr. Hogan?

In evaluating whether an employer had notice of an employee's sexual harassment, we have stated, albeit in an unpublished opinion, that "[t]here is no magic word requirement. That is, the employee need not label the events 'sexual harassment' in order to place an employer on notice of the offending behavior. However, a jury certainly would be free to consider such evidence, as a part of a bigger picture, when evaluating whether the substance of [the employee's] complaints . . . were sufficient to place [her employer] on notice of her sexual-harassment claim." *Olson v. Lowe's Home Ctrs. Inc.*, 130 F. App'x 380, 391 n.22 (11th Cir. 2005). *Cf. Okoli v. City of Baltimore*, 648 F.3d 216, 223–24 & n.8 (4th Cir. 2011) (holding that an employee's complaint constituted protected activity even

23

though "it did not explicitly mention sexual harassment" because "[t]he City surely should have known that [her] complaints of 'harassment' likely encompassed sexual harassment"); *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.").

The same should be true here: there should be "no magic words" required to put Mr. Hogan on notice of Ms. Martin's complaint. It should not matter that the email from Ms. Bayne to Mr. Hogan did not expressly say "targeted *based on race and gender*." Ms. Martin complained that she was "targeted"—a word with a specific connotation—and Mr. Hogan was aware that she previously complained that he discriminated against her based on race and gender. That, in my view, should be enough to send the case to the jury. *Cf. Dawson v. Entek Int'l*, 630 F.3d 928, 936–37 (9th Cir. 2011) (holding that there was enough circumstantial evidence of retaliation to withstand summary judgment, including that the plaintiff met with human resources to complain about sexual orientation discrimination, was terminated less than 48 hours later, and that earlier in his employment, he had previously spoken to his supervisor about the sexual orientation discrimination he was experiencing).

The majority says it is too speculative to infer from Ms. Martin's prior EEOC charge that Mr. Hogan would have understood "targeted" to mean targeted based on

24

race or gender.  It relies on *Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc).  In *Maniccia*, we explained that the passage of 15 months between the plaintiff's grievance and the adverse employment action prevented an inference that the former caused the latter.  But the issue here is not a lack of temporal proximity between the protected expression and the adverse employment action.  Indeed, here there is close proximity—only two days—between when Ms. Martin complained to human resources and when she was fired.

Instead, the question is whether Ms. Martin presented enough evidence for a reasonable jury to find that Mr. Hogan had knowledge of her protected expression in February of 2014.  The 2012 EEOC complaint and Mr. Hogan's knowledge of, and settlement of, the 2012 charge is simply evidence from which a jury could find that Mr. Hogan knew that Ms. Martin's February 2014 complaint was again about race or gender.

I would therefore reverse the district court's grant of summary judgment on Ms. Martin's Title VII retaliation claim.  On this record, it should be up to a jury to decide whether Mr. Hogan retaliated against Ms. Martin because she—once again—complained that he discriminated against her based on her race or gender.

25