**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 7, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JUAN DOMINGUEZ,

    Plaintiff - Appellant,

v.

WEISER SECURITY SERVICES, INC.,

    Defendant - Appellee.

No. 25-6061

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:21-CV-00653-SLP)**
_____

Mark Hammons, Hammons, Hurst & Associates, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Nathan L. Whatley, McAfee & Taft, A Professional Corporation, Oklahoma City, Oklahoma, for Defendant-Appellee.
_____

Before **HARTZ**, **KELLY**, and **TYMKOVICH**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

When Weiser Security Services fired Juan Dominguez in June 2020 it claimed he had breached company protocols and shirked his duties relating to its COVID policies. In the days prior to his termination, Dominguez reported his supervisor for allegedly giving preferential treatment to female employees. Dominguez believes

Weiser fired him in retaliation for that report and insists its performance criticisms are pretextual. He sued Weiser for unlawful retaliation under Title VII of the Civil Rights Act of 1964. The district court granted Weiser's motion for summary judgment because Dominguez had not offered sufficient evidence of causation for his prima facie case.

Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM.** To prove causation on a retaliation claim, a plaintiff must show either that the decisionmaker on the adverse employment action knew of his protected activity, or that a person harboring retaliatory animus knew and used the decisionmaker as a cat's paw. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). Dominguez has done neither. Instead, he invites the factfinder to fill in the gaps with speculation about what his supervisor and branch manager knew. The evidentiary bar at this stage is low, but it is still Dominguez's to hurdle. He has not, and the district court correctly granted summary judgment for Weiser.

## I.    Background

### A.    Factual Background

Weiser Security Services is a contract security company. In 2018, Halliburton Company engaged Weiser to provide security services at its location in Duncan, Oklahoma. Around that time, Weiser hired Juan Dominguez as a guard and supervisor with responsibility for overseeing day shift security officers at the Duncan

site.[1] As part of his duties, Dominguez was expected to provide medical and safety-related training to the officers under his charge. Dominguez reported to Weiser's site manager, Joseph Yates, who reported to Mike Strickland, a Weiser branch manager based in Fort Worth, Texas. At all relevant times, Halliburton's security manager for the Duncan facility, Chip Ford, oversaw Weiser's contract performance.

From late 2019 to early 2020, Yates took medical leave and Dominguez assumed some of Yates's normal duties. During Yates's absence, Dominguez told Ford and Strickland that he believed Yates gave preferential treatment to female employees. When Yates returned to work in early 2020, Weiser transferred his responsibility for employee-relations issues to Dominguez. Around the same time, Weiser selected Dominguez for its first and only "Officer of the Month" award.

In April 2020, another security guard at the Duncan site, Robert Culberson, contacted Weiser's Human Resources Department to complain that Yates had discriminated against him because of his race. Culberson is black and claimed Yates had withheld advancement opportunities from him on that basis. Weiser's Vice President of Human Relations, Charlene Lee-Sutherlin, notified Strickland and Ford of Culberson's complaint and initiated an investigation. Lee-Sutherlin traveled to Duncan to conduct in-person interviews with Weiser employees on June 10 and 11.

---

[1] Dominguez had worked at the facility as a security officer and shift supervisor for the previous contract-holder since 2010. When Weiser took over the contract, it hired Dominguez into an equivalent role.

3

Dominguez met with Lee-Sutherlin on June 10 as part of the investigation. While the focus of their conversation was Culberson's race-discrimination complaint, Dominguez told Lee-Sutherlin that he believed Yates had shown favoritism to female guards, especially those who flirted with him. Those comments echoed the remarks Dominguez made to Strickland and Ford while Yates was on medical leave. Lee-Sutherlin did not tell Yates or Strickland about Dominguez's comments, and Dominguez denies discussing the content of the conversation with anyone else.

Around the same time, Yates and Dominguez clashed over Dominguez's job performance. On June 2, Yates told Dominguez they needed to "get aligned" and "start working together" because failing to do so would cost "either [Dominguez's] or [Yates's] job." App. 94. Dominguez claims Yates also admitted he treated women better than men and that he knew he would be investigated because of it. App. 271. Dominguez and Yates also disagreed about Dominguez's compliance with a mask mandate Weiser implemented in response to the COVID-19 pandemic. On June 5, Yates saw Dominguez in the security control room without a mask and reminded him to wear one. Dominguez replied that he would do so "going forward." App. 74. Later that day, Dominguez left work to get a COVID test after learning he was potentially exposed to the virus by a family member. He told Yates he needed to leave for a personal matter and did not report his suspected exposure until after receiving a negative test result that evening.

In early June, Halliburton decided to implement temperature checks for all people entering the Duncan facility. Weiser security guards would perform the

4

checks and needed training before the rollout on June 15. Yates was responsible for training the shift supervisors who, in turn, would train the other guards. Yates reviewed the training with Dominguez and Justin Chasteen, another day shift supervisor, for about ten-to-fifteen minutes on June 8. On June 10—the same day Dominguez met with Lee-Sutherlin—Yates emailed the shift supervisors to remind them that all officers needed to be trained by the next day. Yates then called Dominguez and yelled at him about the need to get the training done.

The next day, June 11, Lee-Sutherlin interviewed Yates as part of her investigation into Culberson's race-discrimination complaint. Lee-Sutherlin informed Yates "he was part of the investigation and a complaint," App. 301, and Yates relayed his belief that he was experiencing issues with Dominguez and that Dominguez did not like him, App. 311.

On June 12, Yates told Dominguez and Chasteen they needed to retrain all the officers. Yates also sent Strickland a copy of his June 10 email to the supervisors, explaining he had sent it after learning Dominguez had not trained three officers. At that time, Ford told Strickland he was upset that the guards had not been sufficiently trained, and he was unhappy about Dominguez's apparent failure to wear a mask in the security control room and to promptly report his potential COVID exposure on June 5.

To ensure the officers would be ready for the June 15 rollout, Yates, Strickland, and Ford went to the Duncan site on Saturday, June 13, to complete the training. Dominguez was typically off-duty on Saturdays and did not attend. Yates

told Strickland that he had instructed Dominguez to be there. Dominguez says he was not told to attend, and Weiser has not offered admissible evidence to the contrary.

Strickland says he made the decision to fire Dominguez on June 16 based on: (1) Ford's request that Dominguez be removed from the contract, (2) his belief that Dominguez had not adequately trained his officers on temperature check procedures, (3) his belief that Dominguez ignored COVID protocols, (4) his perception that Dominguez had recent performance and attitude problems, and (5) his belief that Dominguez skipped the Saturday training without notice. App. 48–49. Yates completed and signed Dominguez's termination form, which indicated Strickland terminated Dominguez on June 19 for "continued performance issues," "not properly training officers for temperature checks," and "not coming in to assist with training when told by management." App. 373.

### B.    Procedural Background

Dominguez sued Weiser under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), for unlawfully retaliating against him for reporting Yates's alleged sex discrimination to Lee-Sutherlin. According to Dominguez, Weiser's stated reasons for firing him are pretexts to cover its retaliatory motive.

Weiser moved for summary judgment on the grounds that Dominguez had not offered evidence of causation to support his prima facie case of retaliation under the

6

*McDonnell Douglas* framework.[2]  The district court agreed and granted the motion.

Critically, the court found Dominguez could not prove that Strickland, the

decisionmaker on his firing, knew about his report to Lee-Sutherlin on June 10.  App.

485–87.  The court also rejected Dominguez's cat's paw theory, finding Dominguez

could not prove that Yates, the alleged biased actor, knew about his sex

discrimination report.  App. 487–92.  According to the district court, without

sufficient evidence that the relevant actors knew about the protected activity,

Dominguez could not prove his firing was motivated by retaliatory animus.

App. 492.

Dominguez now appeals the court's grant of summary judgment for Weiser.

## II.    Discussion

Dominguez argues that the district court was wrong about the causation

element of his prima facie case.[3]  He contends that a jury could infer that Strickland

and Yates knew about his report to Lee-Sutherlin, and the court overlooked that

possibility because it improperly drew inferences against him, the non-moving party.

Opening Br. 22–23.  Ultimately, Dominguez's case hinges on whether he can prove

---

[2] The district court assumed, without deciding, that Dominguez's report was protected activity satisfying the first element of a prima facie case.  App. 483 n.17. And it determined a termination was clearly an adverse employment action that satisfies the second element.  App. 482 n.16.

[3] Neither party contests the district court's assumption that Dominguez's report was protected activity or its holding that his termination was an adverse employment action.

7

either Strickland or Yates knew about his protected activity. We analyze his retaliation theories in turn.

### A.     Standard of Review

"We review a district court's grant of summary judgment de novo, using the same standard applied by the district court pursuant to Fed. R. Civ. P. 56(a)." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). When applying this standard, "[w]e must 'view facts in the light most favorable to' the non-moving parties, . . . resolving all factual disputes and reasonable inferences in their favor." *Id.* (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)). "Summary judgment must be granted if 'there is no genuine dispute as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

"For dispositive issues on which the [nonmovant] will bear the burden of proof at trial, he must 'go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment.'" *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (alteration in original) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a

8

jury or whether it is so one-sided that one party must prevail as a matter of law." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1179 (10th Cir. 2007) (citation modified).

### B.    Title VII Retaliation Prima Facie Case

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Additionally, an employer may not retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.* § 2000e-3(a).

"Title VII forbids retaliation against employees who voice opposition to, or participate in an investigation or proceeding alleging, an unlawful employment practice by his or her employer."  *Montes*, 497 F.3d at 1176 (citing 42 U.S.C. § 2000e-3(a)).  In the absence of direct evidence, a Title VII retaliation claim is evaluated under the *McDonnell Douglas* framework.  *Id.*  "In order to state a *prima facie* case for retaliation under *McDonnell Douglas*'s first step, [Dominguez] must demonstrate that (1) [he] engaged in protected opposition to discrimination; (2) [he] suffered an adverse action that a reasonable employee would have found material; and (3) a causal nexus exists between [his] opposition and the employer's adverse action."  *Id.*

### C.    *Dominguez's Direct Retaliation Theory*

One pathway to prove causation is through the person (or people) who made the final decision to take the adverse employment action.  Under this direct retaliation framework, proving causation requires Dominguez to "show that the decisionmaker[] took action against him out of a desire to retaliate for his formal discrimination complaints."  *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019) (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).  "As a prerequisite to this showing, [Dominguez] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to [take adverse action against him] had knowledge of his protected activity."  *Id.* (second alteration in original) (quoting *Hinds*, 523 F.3d at 1203).  "[Dominguez] must therefore point to evidence that those who acted against him knew of his formal complaints."  *Id.*

There is no legitimate dispute that Strickland was the ultimate decisionmaker on Dominguez's termination.  Dominguez suggests a jury could infer that Yates was the true decisionmaker but bases that assertion on his belief that Yates manipulated Strickland into making the termination.[4]  App. 183–86.  But the claim that a biased

---

[4] Dominguez also implies in his opening brief that a jury could decide Yates was the final decisionmaker because Yates signed the termination form.  Opening Br. 4.  That theory is both late and underdeveloped, and we need not consider it.  *See Utah Animal Rts. Coal. v. Salt Lake Cnty.*, 566 F.3d 1236, 1244 (10th Cir. 2009).  Even so, the termination form says, "Mike Strickland came in to do terminations for continued performance issues," indicating Yates was merely documenting an action

actor manipulated the decisionmaker is a cat's paw theory; not evidence that the actor was the real decisionmaker. Dominguez presents no evidence that Yates—or anyone other than Strickland—had authority to fire him. In fact, his opposition to summary judgment concedes the point when it alleges, "[b]ased on the false complaints of Yates, *Strickland made a decision to fire Dominguez* on June 16." App. 185 (emphasis added).

Consequently, Dominguez must prove Strickland was aware of his sex discrimination report to Lee-Sutherlin to succeed on his direct retaliation theory. *Montes*, 497 F.3d at 1176. He has not. Strickland says he was unaware of what Dominguez told Lee-Sutherlin when he made the termination decision. App. 49. Both Lee-Sutherlin and Dominguez deny ever telling Strickland the contents of their conversation. App. 117; App. 469. So the only people who knew Dominguez made a sex discrimination complaint on June 10 did not relay that information to Strickland. Further, Strickland knew the subject of Lee-Sutherlin's investigation was alleged racial discrimination by Yates because Weiser's HR had given Strickland a copy of Culberson's complaint. App. 293. Asking a jury to infer that Strickland knew Dominguez made a sex discrimination complaint merely because Dominguez was interviewed as part of an unrelated race discrimination investigation invites speculation. And "bare speculation" about knowledge is not enough to overcome

---

taken by Strickland. App. 373. Given the form's own description of events, it cannot support a finding that Yates was the real decisionmaker.

summary judgment. *Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1328–29 (10th Cir. 2023).



Figure 1: Causal break in Dominguez's direct retaliation theory

Dominguez tries to work around these evidentiary failures by claiming Yates knew about the report and told Strickland. Opening Br. 33. As we discuss in the cat's paw inquiry below, we determine there is insufficient evidence to support a finding that Yates knew Dominguez reported him for sex discrimination. But even assuming Yates knew about Dominguez's comment to Lee-Sutherlin, we still find in Weiser's favor. Dominguez concedes that he has no direct evidence Yates told Strickland about the June 10 report. Reply Br. 15. Strickland testified that no one (including Yates) told him about the sex discrimination allegation. App. 49. And Dominguez did not develop any evidence from Yates (by deposition or otherwise) about a relevant conversation between Yates and Strickland. Instead, he argues a jury could infer Yates "shared his belief" that Dominguez reported him for sex discrimination because Strickland and Yates were "in regular communication . . . about [him]" between June 10 and June 19. Opening Br. 33. But evidence that a

supervisor with knowledge of protected activity had the opportunity to tell a decisionmaker is "not a substitute for evidence that [he] did so." *Lindsay*, 88 F.4th at 1328 (quoting *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020)). Dominguez has the burden of proving Strickland knew he reported Yates for sex discrimination; and evidence of Strickland's discussions with Yates about Dominguez's performance "is support for only speculation, not a finding, that [Strickland] had knowledge." *Id.* at 1328–29.

Finally, Dominguez argues we should infer causation because the reason Strickland fired him—his failure to attend the weekend training session—was fabricated and therefore pretextual. The district court declined to consider Dominguez's pretext evidence, reasoning that the failure to prove Strickland knew about the protected activity made any alleged pretext irrelevant. We agree with that approach. Pretext evidence "may be considered under appropriate circumstances in assessing the prima facie case." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008) (citing *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1317 (10th Cir. 2006)). But a plaintiff has "the burden of establishing an inference of actionable discriminatory animus in the first instance." *Id.* Otherwise, "evidence of 'pretext' merely establishes that an employer's stated reason for its actions may not be its real or only reason." *Id.* "It does not establish that the real or 'but-for' reason was unlawful [retaliation]." *Id.* If Strickland did not know about Dominguez's sex discrimination report, there is no way retaliation for the report could have been "the real or 'but-for' reason" for the termination decision.

13

*See id.*; *see also Montes*, 497 F.3d at 1176. So even assuming Strickland's reasons for firing Dominguez were pretextual, Dominguez has not established causation.

In sum, Dominguez has not put forward adequate evidence for a jury to find that Strickland knew about his sex discrimination report to Lee-Sutherlin. Since Strickland did not know about the relevant protected activity, his decision to terminate Dominguez could not have been retaliation for that activity.

### D.    *Dominguez's Cat's Paw Theory*

Dominguez argues Weiser is liable for retaliation even if Strickland was unaware of his protected activity because Yates knew about it and caused his termination. Opening Br. 43. In making that argument Dominguez invokes the cat's paw theory of causation,[5] by which "the biased motive of a subordinate can be imputed to the unbiased, final decisionmaker." *Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1114 (10th Cir. 2025) (citing *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484–86 (10th Cir. 2006)).

---

[5] The term "cat's paw" comes from a story in Aesop's Fables that first entered employment discrimination law in 1990. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). As described by Justice Scalia,

> In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011).

14

An employer is liable for retaliation under the cat's paw theory when an employee who harbors discriminatory animus knows about protected activity and uses a decisionmaker to accomplish his "own biased designs." *Montes*, 497 F.3d at 1176. To survive summary judgment, Dominguez must show a reasonable jury could find "(1) [Yates] took action motivated by retaliatory animus, (2) [he] intended the action to cause a materially adverse action, and (3) [his] action was a but-for cause of the intended adverse action." *Byrnes*, 158 F.4th at 1121.

The district court assumed that Dominguez's evidence that Yates lied to Strickland about telling Dominguez to attend the Saturday training could satisfy the second and third elements of the cat's paw inquiry. App. 488–89. Still, the court held Dominguez's argument failed because he could not show Yates knew about the report to Lee-Sutherlin. And if Yates did not know, then his actions to get Dominguez fired could not have been motivated by a desire to retaliate for the relevant protected activity. Thus, Yates's actions were not motivated by retaliatory animus and Dominguez could not prove the first element of his cat's paw theory. We agree.

Cat's paw causation depends on a showing that the alleged biased actor *knew* about the protected activity. *Montes*, 497 F.3d at 1176. Otherwise, there is no retaliatory link between that protected activity and the adverse employment action. *See id.* Dominguez argues a jury could conclude Yates knew about his June 10 report based on three pieces of evidence. First, Dominguez's deposition retells a conversation that he says took place between Yates and himself before he was

15

terminated. According to Dominguez, sometime in "the weeks prior" to June 10, Yates told Dominguez that they needed to get aligned and start working together or one of them would lose his job. App. 94. Dominguez also claims Yates, "in the context of that conversation," said he knew "complaints about gender treatment had been made against him," admitted he "treated women better than . . . men," and said he knew he would be investigated.[6] App. 270–71. Dominguez says a jury could reasonably view these remarks "as a threat against cooperating in the investigation." Opening Br. 43.

The problem with Dominguez's argument is that he has not alleged Weiser retaliated against him for cooperating in the investigation into Culberson's complaint. Rather, his complaint claims the retaliation was "for reporting and opposing sexual harassment and gender discrimination . . . [o]n or around June 10, 2020." App. 6–7. So the relevance of whether a jury could find Yates's remarks constituted a threat

---

[6] In his motion opposing summary judgment, Dominguez claimed Yates told him: "I know you complained about me to Robert and Mike, and we better get aligned . . . or it was going to be my job on the line or his [Yates'] job on the line." App. 183 (alterations in original). The district court explained that this claim "cobbles together part of [Dominguez's] own deposition testimony with a question from counsel *posed 35 pages later* to make it appear as if Mr. Yates's comments about getting aligned were tied to [Dominguez's] earlier complaints to Mr. Strickland and Mr. Bullock." App. 490 n.24. In truth, Dominguez's testimony "does not create the link that his counsel suggests." App. 490 n.24. The court presumed this was an oversight rather than an attempt to mislead.

Unfortunately, Dominguez's counsel has committed the same error on appeal. *See* Opening Br. 15 ("Yates also said: 'I know you complained about me to Robert and Mike, and we better get aligned . . .or it was going to be my job on the line or his [Yates'] job on the line.'").

against cooperating in the investigation is unclear. What matters is whether Yates knew Dominguez reported sex discrimination as part of the investigation on June 10. Thus, the threat is relevant only if it supports an inference that Yates's expectations converted into knowledge of Dominguez's protected activity.

We find such an inference is untenable, even accepting Dominguez's account of the conversation. The conversation took place *before* Dominguez's protected activity and there is no evidence that Yates knew he was part of an actual, ongoing investigation until his conversation with Lee-Sutherlin on June 11. *See* App. 491. As the district court noted, Yates's beliefs in the weeks before the on-site investigation shed little light, if any, on what Yates believed—let alone knew—about the investigation once Lee-Sutherlin started interviewing employees. Consequently, a jury would have to speculate that Yates's expectations would lead him to knowledge that Dominguez reported him for sex discrimination, despite the investigation being unrelated to that claim. To credit Dominguez's contention, we need some evidence that Yates's pre-investigation suspicions led him to conclude that Dominguez actually reported sex discrimination on June 10.

Dominguez tries to make this showing through two other pieces of cat's paw evidence, but neither gets him across the line. The first is a phone call from Yates to Dominguez on the evening of June 10 in which Yates yelled at Dominguez about his failure to train his officers. Dominguez argues the call "could reasonably be viewed as anger over the fact that Dominguez had consented to be interviewed." Opening Br. 43. But neither Dominguez nor Yates mentioned the investigation or that

17

Lee-Sutherlin had interviewed Dominguez earlier in the day.  The phone call came on the heels of Yates's email to shift supervisors complaining about the training deficiencies, and training was the only topic discussed.  Training was undisputably a live issue at the time, with Halliburton's deadline looming and Strickland and Ford pressuring Weiser's Duncan employees to be ready by June 15.  On the other hand, Dominguez identifies no evidence linking the phone call to his interview with Lee-Sutherlin or his remarks therein.  Without such evidence, and in the face of the plausible explanation that the call was motivated by the training issues, Dominguez asks a jury to speculate that Yates was mad about the interview.

More fundamentally, Dominguez's line of argument cannot support the inference he asks the jury to make.  Dominguez's complaint is limited to his report of sex discrimination on June 10.  Even if the angry phone call were proof that Yates was upset by Dominguez's participation in the race-discrimination investigation, it would not prove a link to the relevant protected activity.  That requires some evidence that Yates was upset not just about Dominguez's cooperation, but specifically about Dominguez's report of sex discrimination.  Dominguez points to no such evidence and, once again, invites mere speculation.

Dominguez's third, and final, line of evidence is Yates's apparent fabrication of an accusation that Dominguez failed to attend the Saturday training session.  According to Dominguez, that fabrication is proof of retaliatory animus that satisfies the first cat's paw element.  Opening Br. 43.  Dominguez is right that "retaliatory animus may be shown by evidence of pretext."  *Byrnes*, 158 F.4th at 1121.  But the

evidence's relevance depends on Dominguez making the predicate showing that Yates knew about his protected activity. *See Montes*, 497 F.3d at 1176. Yates's false accusation is certainly evidence of pretext for some bad motive. But, as the district court recognized, it could prove "something more benign" than retaliation for protected activity, "like mere dislike." App. 492. Given the circumstances, it could also be an attempt by Yates to shift blame for training shortfalls, or any number of other hidden purposes. Contrary to Dominguez's contention that the district court drew an inference against him, recognition of these alternatives merely reflects that, without more evidence, Yates's true motive is a matter of speculation. And without evidence that Yates was aware of Dominguez's remarks, the fabrication alone cannot prove Yates acted in retaliation for those remarks. *See Adamson*, 514 F.3d at 1144 (warning against "conflating evidence tending to cast doubt on an employer's stated reasons for an employment decision with the burden of establishing an inference of actionable discriminatory animus in the first instance").

19

The following chart shows the break in causation under the cat's paw theory:



Figure 2: Causal break in Dominguez's Cat's Paw theory

Dominguez has not produced sufficient evidence to support a reasonable inference that Yates knew about his remarks to Lee-Sutherlin on June 10. And Yates could not have used Strickland to retaliate for protected activity that Yates did not know about. *See Montes*, 497 F.3d at 1176. As a result, Dominguez's cat's paw theory for Weiser's liability fails.

## III.   Conclusion

For the foregoing reasons, we affirm the district court's judgment.