**FILED**
**MARCH 20, 2025**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ISABEL CONTRERAS, | ) | No. 39868-4-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF YAKIMA, a Washington | ) | |
| municipal corporation; ALVIE MAXEY | ) | |
| and his community property; DEBBIE | ) | UNPUBLISHED OPINION |
| DEXTER and her community property; | ) | |
| WAYNE PARSLEY and his community | ) | |
| property; SCOTT SCHAFER and his | ) | |
| community property; and ALEX | ) | |
| MEYERHOFF and her community | ) | |
| property, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. — We address two distinct subject matters: wrongful discharge in violation of public policy and peremptory juror challenges. Under Washington's law of wrongful discharge from employment, the employee must show, as part of a retaliation claim, that the employer's decision maker knew or suspected that the employee engaged in a protected activity. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 430 P.3d 229 (2018). This appeal commands us to determine what quality and quantity of evidence the

employee must present to show knowledge or suspicion of the protected action. We affirm the trial court's summary judgment dismissal of appellant Isabel Contreras's claim because she failed to present facts from which the trier of fact could conclude that the city of Yakima agent, who decided to fire her, knew of her exercise of union rights.

At a trial on employment discrimination claims other than the wrongful discharge retaliation claim, plaintiff Isabel Contreras objected to the city of Yakima's peremptory removal of a Latinx prospective juror. In response, Yakima argued that it could not understand an answer given by the juror. The trial court permitted the peremptory challenge. We reverse this trial court's decision because GR 37 discourages the exercise of a peremptory challenge based on the inability to understand a juror's answer, when the challenger possessed an opportunity to ask the juror to explain her answer. Thus, we reverse the jury verdict and remand for a new trial on Isabel Contreras's remaining claims.

FACTS

This appeal concerns Isabel Contreras's termination from employment as a bus operator with Yakima Transit, an arm of defendant city of Yakima. Yakima contends its city manager Robert Harrison discharged Contreras because of a series of unsafe bus driving incidents. Contreras contends Yakima fired her because she exercised union rights.

Isabel Contreras commenced employment as a transit operator for the city of Yakima in January 2011. The city fired her on September 10, 2020. As a bus driver, Contreras belonged to a union.

The Yakima Transit Operators Policy and Procedures Manual (policy manual) governed Isabel Contreras's employment. We summarize some and quote other policies important to this appeal. Policy 1.3 outlines a progressive corrective employee discipline scheme based on the severity and frequency of violations. Discipline starts with oral reprimands and escalates to written reprimands, suspensions, and discharge. Policy 1.3(B) declares in part:

> Suspension—Relieving an employee from work with or without pay for one or more days will constitute a suspension. Usually a suspension will be used when a third offense of minor infractions or a second offense of a more serious infraction has occurred.
> Discharge—Involuntary termination of an employee for cause from the City service will constitute a discharge. Usually discharge will be usewhen there is a fourth offense of a minor infraction, a third offense of a more serious infraction or a first offense of an intolerable infraction.

Clerk's Paper (CP) at 117-18 (boldface omitted)

Subsection 1.3(D) of the policy manual grants city employees a right to union representation. The section states, in relevant part: "The employee will always have the right to have a representative present *whenever disciplinary action is being discussed with the supervisor*." CP at 119 (emphasis added).

Policies 3.2(A)(2) and (4) address traffic and passenger safety:

3

2. All Operators will obey the speed limit.  All Operators are to make a full stop at stop signs.  The bus must be completely through the intersection before the signal turns red.  Violation of any of these provisions is considered a more serious infraction with a written reprimand as the minimum disciplinary action for the first offense.
. . . .
4. Operators will wait until elderly, disabled, mothers with small children, or any age gender with packages; have been seated before proceeding from a bus stop.

CP at 124.  Policy manual subsection 5.1(A)(2) mandates that Transit employees "know and obey traffic laws as stated in the Washington State Drivers Manual and county and municipal regulations governing bus operations."  CP at 248 (boldface omitted).

Yakima Transit busses are equipped with cameras that audio and video record from various angles inside the bus while the bus moves.  Section 1.10 of the Yakima policy manual announces a video camera policy that declares:

The video camera recordings on busses are useful tools utilized to investigate reported incidents and accidents associated with Yakima Transit.  The information received via the video cameras can be used to confirm or deny allegations and complaints from citizens, passengers, or drivers.  Video cameras can also greatly aid to protect Transit Operators and have been utilized to defend Operators from wrongful accusations as well as capture images of passenger misconduct, which is used to determine issues such as banning unruly customers from using Yakima Transit.  *Video cameras are also used as part of any accident or incident investigation* and may also be viewed by law enforcement officers or others designated by Transit management.  In short, Yakima Transit's use of video cameras helps to protect the City of Yakima, our Operators and our customers on many levels.
Complaint process/video footage:
1) If a complaint is received by Yakima Transit from a concerned citizen, passenger, or driver, the complaint will be put in writing and forwarded to a supervisor.  No complaint will be processed or considered

4

legitimate unless the complainant provides a minimum of their name and a phone number by which they can be contacted. Addresses of complainants are not required to process a complaint but this information should be sought after by any who receive complaints and obtained whenever possible.

      a. The supervisor, upon receiving a processed complaint or upon receiving a complaint personally, may review all video footage associated with the alleged incident.

      b. During an investigation which involves the use of video footage, the supervisor's purpose for reviewing the video footage is to look only for facts regarding the complaint. All other minor driver infractions found are not subject to disciplinary action, but the supervisor may discuss with the driver those infractions while reviewing the video and advise them as to the correct procedure that should be followed.

      c. Video camera footage alone is not to be utilized by Yakima Transit Management or its designees in a manner that *begins or launches* an official investigation as video footage is intended to be used *retroactively* as a tool aiding the investigation of reported accidents, incidents and complaints. *However, if upon reviewing a specific incident, a supervisor also observes a major infraction such as the Operator violating State or Federal law, the Operators* [*sic*] *unlawful behavior may result in disciplinary action even if the major infraction is unrelated to the initial cause for the investigation.*

CP at 145-46 (boldface omitted) (some emphasis added) (alterations added).

We move to the conduct of bus driver Isabel Contreras. On January 4, 2017, Yakima Transit received the following email from a citizen regarding an incident on January 2:

You need to watch your drivers. I was on my way to [W]almart the nac [sic] way and almost got hit head on by one of your city buses cuz [sic] they ran the stop sign at fast speed. If I wasn't paying attention and stopped he would have hit us head on. That is ridiculous for them to be driving that way. It's [sic] was about 615 620 the back way to [W]almart. I was scared for my life. They ran stop sign and came straight for us. I tried to call but

5

no one answered I am very worried and concerned I would like to hear back from you guys.

CP at 161 (alterations added).  Upon concluding Contreras drove the bus referenced in this email, a Yakima Transit supervisor reviewed the video recording from the bus cameras and confirmed Contreras's failure to stop at a stop sign.  The stop sign violation almost caused a collision with an oncoming car.

On February 8, 2017, Yakima Transit held a pre-disciplinary hearing with Isabel Contreras regarding the January 2 incident.  On February 14, Transit Manager Alvie Maxey, on behalf of Yakima Transit, sent Contreras a letter announcing the substantiation of the e-mail's allegations.  Yakima Transit imposed the sanction of a written reprimand.  The Transit also directed Contreras to successfully complete a defensive driving class by February 28.

We proceed forward three years.  On May 6, 2020, citizen Sharon contacted Yakima Transit to report an incident that occurred on Isabel Contreras's bus that day. We do not know Sharon's surname.  Sharon complained about Contreras charging her the full bus fare despite Sharon being a senior citizen.  Sharon also protested that Contreras later banned her from riding the bus.  On the same day, Contreras's direct supervisor, Jeff Beaver, reviewed the video footage from Contreras's bus to scrutinize Sharon's allegations.  When reviewing the footage, Beaver confirmed the truth of Sharon's allegations.  He also observed Contreras failing to stop at five stop signs.  Both the

situations involving Sharon and Contreras's repeated failure to stop at stop signs occurred on the same day. We refer to Contreras's failures to stop on May 6 as the "California stops incidents" and refer to the facts behind Sharon's complaint as the "Sharon incident."

Despite being Isabel Contreras's immediate supervisor, Jeff Beaver lacked authority to discipline her for any misconduct. But Beaver could report Contreras's conduct to Yakima Transit managers.

On May 7, 2020, Isabel Contreras's supervisor, Jeff Beaver, filed an investigation report concerning the Sharon incident, which report we quote in its entirety:

> On May 6, 2020 at 12:40 pm a woman (Sharon) boards Izzy's [Isabel Contreras's] bus RT 6, 12 # 68 on Fair Ave at Fiesta Foods. Sharon boarded the bus and paid 50 cents but she didn't have her gold reduced fare card and Izzy questioned her on it.
> Sharon said she was 66 and that this is bullshit and Izzy asked her to leave the bus but then she paid the extra 50 cents and Izzy gave her a transfer and she sat down.
> 7 minutes later Sharon de-boards at Walmart. After getting off the bus she chatters outside the bus to boarding passengers but she can't be understood on the audio but it ends with telling Izzy to "shut the F*** up I'm off the bus now[.]"
> Meanwhile Sharon called Dispatch and they patched her through to me. She said Izzy was not going to let her ride and was trying not to have the other driver pick her up and that she was old and sick and needed to get home. I took her info and told her to get on the next bus and we'd ger her home and I'd investigate the incident.
> At 1:09 Izzy returns to Walmart and Sharon is waiting along with other passengers. Izzy gets off the bus to tell her she can't ride but she gets on anyway saying she'd talked to me and I said she could ride. Izzy told her to get off and Sharon said she would have to call her an ambulance due to her low blood sugar.

7

> Izzy immediately calls to see if Sharon can ride, going into detail over the radio as to what happened earlier. I told Izzy to let her ride and if she had any further trouble to let me know. Izzy waited about 30 seconds to respond and said sarcastically, "I copy that, thanks for the backup" to which I responded, "Be careful what you say on the radio, let me know if you have any more issues."
>
> I later called Sharon at home to inform her that she was out of line yelling and swearing at Izzy like that and if she continued with that sort of behavior she wouldn't be able to ride. I also explained how our Reduced Fare policy works. I informed her that Izzy was doing her job by asking for the ID card and that she has to show her gold reduced fare ID card when she boards if she wants to ride at the reduced fee.

CP at 288 (some alterations added).

According to Jeff Beaver, he divorced in his mind the Sharon incident from the California stops incidents. Beaver knew on May 7 that the California stops incidents would likely require disciplinary action given the safety violations and violations of Washington State law, while the Sharon incident did not portend any discipline. Thus, Beaver, to the extent of his involvement, intended to address the Sharon incident and California stops incidents separately.

Jeff Beaver requested Isabel Contreras meet with him on May 14 to address Sharon's allegations. Beaver intended no discipline arising from the meeting. He only wished to inform Contreras of his admonition to Sharon. Although the meeting did not portend discipline, Contreras requested that a union representative be present. Beaver did not appreciate Contreras's request. He wanted to informally speak to Contreras about the Sharon incident and believed the presence of a third person would waste time.

8

Nevertheless, Beaver honored Contreras's request because he concluded that Contreras possessed a right of a union representative to be present despite the city not planning to discipline her for the incident. This request delayed the meeting to May 15. The request, according to Beaver, also turned a five-minute conversation into a fifty-minute meeting.

On May 15, 2020, Jeff Beaver and Isabel Contreras met. Union shop steward Martha Torrico attended the meeting with Contreras. Because Contreras brought a witness to the meeting, Beaver procured his Yakima Transit Supervisor Debbie Dexter to also attend on behalf of management.

Jeff Beaver wrote a report about his May 15 meeting with Isabel Conteras:

> Meeting with Isabel Contreras.
> I asked Izzy on Thursday May 14th after her shift if she had a couple minutes to talk. She said she would but only with Union representation. I told her to find someone and we'd meet tomorrow same time.
> On May 15, 2020 at 1:45 pm I had a scheduled meeting with Izzy, Martha [Torrico—Union Rep.], Debbie and I regarding and [sic] incident with Izzy and a passenger (Sharon) on May 6, 2020. . . .What could have been a much shorter one-on-one conversation turned into a more than 50 minute conversation with the Shop Steward and another Supervisor attending.
> I told Izzy that I was disappointed that she wouldn't speak to me personally that implies a trust issue and if there is no trust there's no relationship. She said she's been advised to always have someone go with her to talk to a Supervisor. I told her it sounds like she's getting bad advice. I also informed her that if it were a disciplinary issue I would have recommended union representation but not for a casual conversation.
> She said she felt like I didn't have her back when Sharon told her to Shut the f*** up and that she also called her other derogatory names as well. However; I must point out that the recorded audio did not corroborate any other name calling but some audio was unintelligible.

9

I informed her that I did indeed have her back as I solicited the pertinent information from Sharon to further investigate the incident but that the important thing at the time was to get Sharon home safely as in her words said "she was old and her blood sugar was dropping.["]

I read Izzy the Supervisor report so she could see I called Sharon to let her know her behavior was unacceptable and if she was going to treat our drivers in that fashion she wouldn't be allowed to ride.

. . . .

She tried a few times to divert the conversation to Debbie and how her trust issues with supervisors is [sic] all due to Debbie. I told her that sounds like a conversation they need to have as I tried to keep us on topic.

In the end she apologized for her sarcastic remark over the radio "thanks for the backup" and also for unnecessarily bringing the Shop Steward into the conversation.

CP at 266-67 (some alterations added).

Union representative Martha Torrico, in a deposition, testified about the May 15

meeting:

He [Jeff Beaver] had asked her [Isabel Contreras] for the meeting. And originally she scheduled a time for the meeting so that someone else, myself, could be present. He was upset because—I don't know if it was because she rescheduled so that somebody else could be present. But when I entered the meeting with Izzy, he was visibly upset. His face was red. His body language was kind of—where be crossed his arms and kind of just shrugged his shoulders.

And he said to Izzy that he was offended, that they didn't have any trust between the two of them, that when he calls her in for a meeting, she should be able to come and talk to him without anybody present. They need to build on a relationship.

CP at 718 (alterations added). Debbie Dexter's notes from the meeting read:

Meeting started at 1:45 PM with Isabel, Martha, Jeff and myself present. Isabel started out with her explaining what happen and why she did the things that she did on May 6, 2020. Isabel didn't feel that Jeff had her back with the passenger named Sharon. Isabel said that Sharon had

10

called her "a dirty Mexican" and some other names. Jeff let Isabel know that Sharon had told her shu[t] the F*** up when she had gotten off the bus. Jeff then explained to [her] that she did not have all the facts, that in fact he did have her back. Because once Jeff had talked to Sharon, and then he did view the video. He had called Sharon and explained that she had no right treating Isabel that way, when all she was trying to do was her job. And if she did treat any driver that way again she would not be riding the buses anymore far a while.

. . . .

Jeff then read Isabel the report that he had wrote about the incident on May 6, 2020. Jeff then said that he was disappointed that Isabel thought she needed union representation for a short conversation with him. Jeff stated that he does not feel that she trusts him, because if this was going to be a discipline conversation he would have said so and instructed her to get union representation. Isabel then said it was Debbie's fault that there was no trust. Isabel then went on to criticize me, I made no comments at all during this meeting. Jeff then let Isabel know we needed to stay on topic.

CP at 496 (alterations added).

In a later deposition, Jeff Beaver clarified what he meant when he told Isabel

Contreras there was a lack of trust between them during the meeting:

A. Yes. My only point was that it [the May 15 meeting] was going to be a simple conversation between Isabel and myself, and it didn't need to be turned into something larger.

. . . .

Q. . . . And as far as it becoming a larger issue, are you referring to the fact that Ms. Contreras brought union representation?

A. Oh, she has the right to do that, but it was unnecessary. As it was unnecessary for Debbie Dexter to be there.

. . . .

Q. Okay. Was it a—so when you say larger issue, are you referring to Martha Torrico [the Union Representative] being there?

A. I am just referring to the amount of people there, period. It was unnecessary. It was going to be a five-minute conversation just to update her on my conversation with Sharon.

So it became a larger conversation. Five minutes turned into 50 minutes which was totally unnecessary for this particular conversation.

CP at 292-93 (alterations added).

During the May 15, 2020, meeting, supervisor Jeff Beaver, Isabel Contreras, and shop steward Martha Torrico did not discuss the California stops incidents because those incidents were distinct from the Sharon incident. Beaver wanted to discuss the California stops with his manager before speaking to Contreras on that subject. Beaver's memorandum confirmed that the four attendees did not discuss the California stops.

According to Jeff Beaver, he believed that he and Isabel Contreras ended the May 15 meeting on good terms. Beaver concluded that the May 15 meeting resolved the Sharon incident, and he performed no further investigation into the incident.

In her appeal brief, Isabel Contreras writes that, by May 15, Jeff Beaver had completed the investigation, including watching the video that showed California stops and Contreras's interaction with Sharon. Contreras further writes that Beaver had decided no discipline was warranted. Br. of App't 5. This sentence may be misleading. Beaver had watched the video that depicted the California stops as part of his review of the Sharon incident. Beaver had rejected any discipline for the Sharon incident. Nevertheless, Beaver had not excluded the possibility that one of his superiors might discipline Contreras for the California stops. The citation to the trial court record that

12

Contreras gives in her appeal brief lacks any direct evidence that Beaver had concluded, by May 15, that the California stops merited no discipline.

In her appeal brief, Isabel Contreras also writes that, after the May 15 meeting, Jeff Beaver continued to investigate the Sharon incident. Br. of App't at 6. No direct evidence supports this factual assertion. To the contrary, Beaver testified that he took no further steps, after the meeting, about the Sharon incident.

After the May 15 meeting, Jeff Beaver reviewed again the bus trip video from May 6. Then on May 20, 2020, Beaver sent to a supervisor, Alvie Maxey, the manager of Yakima Transit, an investigation report regarding Isabel Contreras's repeated failure to stop at stop signs on May 6. In the May 20 report, Beaver wrote: "On May 6th while investigating a passenger complaint from a woman named Sharon, I observed Isabel Contreras making several incomplete stops at stop signs (refer to videos Izzy California Stops 1, 2, and 3)." CP at 847.

On May 28, 2020, the city of Yakima delivered a letter to Isabel Contreras informing her of a disciplinary hearing scheduled for June 11 to address the May 6 California stops incidents. On June 12, a day after the hearing, Public Works Director Scott Schafer issued a letter to Contreras explaining that, as a result of the California stops incidents, she was being suspended from work for forty hours without pay. Schafer warned Contreras: "Safety should be a priority at all times. Failure to improve may result in further disciplinary action." CP at 250.

13

On June 16, 2020, four days after Yakima Transit's issuance of the suspension, bus rider Jessica filed a customer complaint with Yakima Transit. Jeff Beaver spoke with Jessica on the phone and created a report for her complaint. Jessica alleged that Isabel Contreras rudely spoke to her and then drove the bus forward before Jessica had time to sit and remove her baby from a stroller.

Yakima Transit Manager Alvie Maxey reviewed the bus camera video of Isabel Contreras's interaction with passenger Jessica. Maxey concluded that Contreras willfully endangered Jessica and her baby. As Jessica entered the bus, Contreras informed Jessica to hurry in boarding and sitting. Contreras started forward progress of the bus as Jessica remained standing and took the baby from the infant carrier. When the mother complained that she was not yet seated, Contreras responded: "'I told you I was moving the bus.'" CP at 568. Maxey recommended termination of Contreras's employment to his supervisors. He concluded that the five earlier failures to stop at a stop sign and the treatment of Jessica demonstrated Contreras endangering the public and merited termination of her employment. Maxey concluded that the conduct in 2020, even without the 2017 incident, warranted termination of employment. Public Works Director Scott Schafer issued a letter to Contreras on June 24 informing her of a disciplinary hearing on July 9 to discuss Jessica's allegations.

During his deposition, Transit Manager Alvie Maxey discussed the Jessica incident. Maxey distinguished between accidents and willful conduct. The following colloquy occurred between Maxey and Isabel Contreras's counsel:

> Q. Okay, so that's a discretionary decision that has to be made with input from everyone within the chain of authority; is that right?
> A. If it's presented as such. In other words, if it's brought to my attention, that's the first if. And then the second is then upon it—upon seeing it I would bring that to [Public Works Director] Scott [Shafer], and then Scott would forward that to human resources and legal. We— typically during even something as small a violation as a written reprimand is concerned, those things go up through Scott to city legal, to HR, and then come back again.

CP at 569 (alterations added). Later in the deposition, Maxey averred:

> Q. Got it. Okay. So I guess the—it's still up to your discretion, or, you know, I guess the city's discretion between you and Scott and the city manager to decide, you know, to take the incident as a whole into account? Would that—would that be fair to say?
> A. Yeah. Let me explain how this typically works, and it might help you out.
> So a supervisor might come to me and with a—a verifiable or verified violation that's transpired. I will discuss that with the supervisor, the—the—the conditions, the circumstances, the evidence, and then I will have a discussion with Scott Schafer, my boss, as soon as possible regarding, you know, the act itself and get his take on it before—generally before I do anything so that we're all on the same page.

CP at 581.

Only Yakima's city manager possessed authority to terminate employment of a city employee, such as Isabel Contreras. Robert Harrison replaced the former city manager in early September 2020, after the Jessica incident but before any decision to

discipline Contreras for the incident. On September 10, after the start of his employment

with the city, Harrison mailed a termination letter to Contreras concerning the June 16

incident. We do not know what papers Harrison reviewed before deciding to terminate

Contreras's employment. At least, neither party identifies the page or pages in the

superior court record that pinpoints what documents Harrison studied. We do not know

if Harrison knew of Jeff Beaver's annoyance resulting from Contreras wanting a union

representative to attend the meeting during which the parties discussed the Sharon

incident. The summary judgment order signed by the superior court lists a declaration of

Harrison as being reviewed by the superior court when entertaining the summary

judgment motion. Nevertheless, neither party forwarded Harrison's declaration to our

court. No evidence suggests that Beaver played any role in Harrison's decision to

terminate Contreras's employment.

Robert Harrison's termination letter declared:

> I have reviewed the files, facts, and circumstances in this case, as well as the information provided at the pre-disciplinary hearing. You did not refute any of the facts presented and I find that the reasons and causes supporting imposition of discipline as set forth in the Notice of Pre-Disciplinary Hearing on file in this matter, are substantiated and sustained.
> You are a transit operator and are responsible for the safety of the passengers on the bus and providing good customer service. Despite your experience, your history indicates a pattern lacking proper safety precautions placing others and yourself in unacceptable levels of grave danger.
> A little over a month prior to this incident, you failed to fully stop your bus at five stop signs [referring to the May 6 California stop incident]. This incident was investigated after a passenger complaint and following a

pre-disciplinary hearing you were suspended without pay for forty hours. What stands out about the timing of that discipline is that you were given the Notice of Discipline for the serious violations on Friday, June 12, 2020 and then committed the current safety offense on Tuesday June 16, 2020.

Your disciplinary history also indicates an incident in 2017 where you failed to fully stop the bus for a stop sign. That incident nearly caused an accident and another vehicle was forced to take sudden action to avoid collision with the bus. For this incident you were given a written reprimand.

Taking all of these circumstances into consideration, and in light of the safety risks inherent in operating transit busses, I have determined that the recommendation from the Public Works Director [Scott Schafer] to terminate your employment is well founded and I hereby notify you that your employment with the City of Yakima is terminated effective 5:00 PM today, Thursday, September 10, 2020.

CP at 262-64.

Isabel Contreras contends that other employees, who incurred similar infractions, received little to no discipline. We list and describe the incidents identified by Contreras as illustrating discriminatory treatment against her. In May 2018, Yakima Transit bus operator Tim missed a turn on his bus route. He pulled the bus into a parking lot to turn around. In doing so, the bus struck a mailbox. Contreras writes in her reply brief that Alvie Maxey employed his discretion to forego a written reprimand against Tim because Tim was a new employee on probation. She cites deposition testimony of Maxey for these factual assertions. Contrary to Contreras's assertion, Maxey testified, during the deposition, that he issued a written reprimand to Tim.

17

In February 2020, Yakima Transit bus driver Cecil crashed the bus into a vehicle while he transported passengers. A Yakima police officer cited Cecil for inattention. A Yakima Transit accident report contained a box headed "Corrective Action Taken." CP at 595. The box was blank. Nevertheless, Maxey testified, at his deposition, that he disciplined Cecil. He did not recall the level of discipline, but averred the discipline would have been at least a written reprimand.

In April 2020, Yakima Transit issued a written reprimand to Transit Operator Brenda. The reprimand followed her taking a detour on an assigned route and causing damage to the bus when, during the detour, the bus entered deep ruts in the roadway. The ruts caused the bottom of the bus to strike the ruts, which crushed the oil pan.

In her appeal brief, Isabel Contreras contends that supervisor Alvie Maxey testified that Yakima Transit should have "potentially" issued a suspension to Brenda. Contreras implies that Yakima Transit imposed no discipline on Brenda. Nevertheless, Maxey did not testify that the Yakima Transit should have suspended Brenda. Maxey testified that he could not remember the form of discipline imposed on Brenda, but the discipline was likely a suspension.

PROCEDURE

Isabel Contreras filed suit against the city of Yakima and three of the city's managers: Alvie Maxey, Debbie Dexter, and Scott Schafer. Contreras alleged claims of (1) violation of Washington Law Against Discrimination (WLAD) based on race, gender,

18

and disability, (2) willful violation of the Washington State Family Leave Act

(interference and retaliation), (3) hostile work environment and quid pro quo

discrimination in violation of WLAD based on race, gender, and disability, and (4)

wrongful termination in violation of public policy (WTVPP). She asserted that Yakima

Transit fired her because of her disability, because she previously complained of

discriminatory treatment, because she reported illegal recordings, because she took

medical leave, and because she needed medical accommodations.

The city of Yakima filed a motion for partial summary judgment seeking judgment

on Isabel Contreras's WTVPP cause of action. In response, Contreras argued, in part,

that evidence showed the city treated other employees outside her protected class better.

According to Contreras, the city did not discipline or meted lesser discipline on these

employees for similar or worse acts.

The superior court granted the city of Yakima's request to dismiss the WTVPP

cause of action. The court reasoned that Isabel Contreras focused on showing a pretext

for her termination from employment without first establishing a prima facie case of

retaliation. Contreras failed to present any evidence that her protected activity was a

substantial cause in her firing.

The superior court entered an order granting the city's motion for partial summary

judgment dismissing Isabel Contreras's WTVPP cause of action at least to the extent that

Contreras had alleged the claim in her first complaint. At the same time, however, the

court entered an order granting Contreras leave to file an amended complaint that alleged

the city wrongfully terminated her employment in violation of public policy because of

her request for union representation at the May 15 meeting with Jeff Beaver.

The city of Yakima filed another motion for partial summary judgment. This

second motion sought dismissal of Isabel Contreras's new WTVPP claim based on her

request for union representation. The superior court granted this motion for partial

summary judgment. The order granting this second motion outlined the causes of action

remaining for trial:

> 1. Plaintiff's racial harassment/hostile work environment claim
> based on race under WLAD;
> 2. Disability harassment/hostile work environment under WLAD;
> 3. Disability and race disparate treatment discrimination under
> WLAD based on the following discipline:
> a. 6/12/20 40-hour suspension; and
> b. 9/10/20 termination.
> 4. Retaliation under WLAD based on the following discipline:
> a. 11/1/18 oral reprimand
> b. 6/12/20 40-hour suspension except as to her request or union
> representation; and
> c. 9/10/20 termination.

CP at 981-82.

Isabel Contreras's suit proceeded to a jury trial. On the first day of trial, Contreras

voluntarily dismissed her disability discrimination cause of action.

Isabel Contreras's second assignment of error on appeal concerns prospective

juror 2, a Hispanic female. During voir dire, juror 2 introduced herself:

20

JUROR NO. 2: . . . I live in [Gr]anger, Washington, and I work in the HR Department, Washington Beef, and my husband works in labor. I like walks and gardening. And to all the other questions, just No. 12, I work in the human resources.

2 Report of Proceedings (2 RP) at 310 (alterations added).

Isabel Contreras's counsel later questioned juror 2:

MR. VALENCIA: Oh, thank you. And we'll get more into that, but that's a—anybody—a anybody have an answer? There is no right answer, but I would conclude it would be (inaudible), and that kind of leads me to my next question.

So—so one of the, you know, people that created and molded our constitution said that in civil cases, you know, this process we're going through, we don't want to go, like, to the—you know, an eye for an eye, tooth for a tooth. When somebody does something to you, whenever there's a dispute, we want to get people together and talk about it, and the only thing we can—we can ask for is for money. We can't put anybody in jail, we can't—we can't fire anyone. We can't—the only thing that we can ask for is money, and one of the—in this case, I'm going to be asking you for a lot of money. I'm going to be asking you for millions of dollars for emotional distress. So no medical bills, no medications. We are going to ask for some wage loss, but the majority of it is going to be for emotional distress, humiliation, loss of enjoyment of life, and that makes me feel a little bit nervous, to be honest. It's a—I'm going to go through my thought process of why this case merits that, but by just hearing what I said in talking about money for emotional distress, you know, what thoughts come up for you? No. 29?

. . . .

MR. VALENCIA: Thank you. Anyone else? Does anyone disagree with Juror No. 29? Does anyone have—does anyone—so, by a show of hands, does anyone think they would be challenged to, like Juror No. 29, calculate what emotional distress or loss of enjoyment of life is worth? Can you say more?

. . . .

JUROR NO. 2: I can respond to that.

MR. VALENCIA: Juror No. 2.

JUROR NO. 2: I believe that if this person is asking for this—so many millions of dollars, I'm sure, at one time, this person was also abusive to the other people. You know, so she got her anger through that, and so she is in distress herself for putting herself also doing that. So things happen that way.

MR. VALENCIA: I'm not sure I understood the first part of what you said.

JUROR NO. 2: That the person that are asking for the settlement?

MR. VALENCIA: Yeah.

JUROR NO. 2: Yes. So, in this case, if she's in distress, did she put herself also in distress? Did she also—when she was—when they were being abusive to her or she was being harassed or discriminated, did she anger herself? Did she get mad at others herself?

MR. VALENCIA: You mean, was she at fault for, like, being in that situation?

JUROR NO. 2: Did she have a little bit of fault for being in that situation?

MR. VALENCIA: So you want—

JUROR NO. 2: I'm not saying she did. If I'm going through a lawsuit, I'm going to be angry. I'm going to be yelling at you for discriminating me, for abusing me. You know, I'm going to get mad, but they didn't see that. Nobody saw that. You know what I'm saying?

MR. VALENCIA: So the anger that the other people may not see, but was cause to her?

JUROR NO. 2: Yes. That's my opinion.

2 RP at 385-89. Yakima's counsel did not ask juror 2 any questions.

At the end of voir dire, the city of Yakima peremptorily challenged prospective juror 2 and potential juror 14. Yakima did not exercise preemptory challenges for any jurors who balked at awarding damages for pain and suffering. Isabel Contreras asserted GR 37 objections to the city's peremptory challenges to jurors 2 and 14. With respect to Ortiz, Contreras's counsel argued:

MR. VALENCIA: Yes. So as to Juror No. 2, they only answered one question that I can remember, which was my question, and it was

22

related to the—the issue of emotional distress, and there was no follow-up questions by the defendant. Juror No. 2 is—looks just like my client. She's Hispanic and a person of color, and based on the factors that Your Honor already went through, I believe that's sufficient to sustain this objection in the fact two of the four peremptory challenges exercised by the defendant were made against people of color, and no specific questions were asked of these jurors to develop a proper reason to actually use a peremptory challenge against them.

THE COURT: Okay. Ms. Bundy?

MS. BUNDY [city of Yakima attorney]: My reason for striking Juror No. 2 is because she made a statement about blame and fault that I could not understand. She also said you couldn't pay someone for emotional distress, and she also made a comment about an individual being surely abusive to others.

THE COURT: I do remember the comment about her saying that, like some kind—like the person would be contributing to the situation if they were wrong, but then they were abusive to other people. Okay. And did you follow up on that?

MS. BUNDY: I don't recall.

THE COURT: Okay. Okay, Mr. Valencia.

MR. VALENCIA: That's—that actually helps the defendant when the juror says that she doesn't think somebody could get paid for emotional distress, and I know that the defendant nor myself followed up with her. And, again, if Ms. Bundy did not understand an answer, that would be more of a for-cause challenge.

THE COURT: Okay. So—go ahead. Anything else you would like to say?

MS. BUNDY: I do.

THE COURT: Okay.

MS. BUNDY: I don't think it's about whether it helps or hurts the defendants. I think it's about whether the answer is grounded in reason or reality or whether it's kind of absurd, and my view was that that was an absurd answer.

THE COURT: About contributing to the—

MS. BUNDY: No—

THE COURT: About the person contributing to the situation?

MS. BUNDY: Sorry. About whether she could award payment for emotional distress.

23

THE COURT: And her answer was about contributing—the person contributing to the situation that was wronged.

MS. BUNDY: I mean, I think that was part of it, but my memory is she said she could not pay someone for emotional distress.

THE COURT: Okay.

MS. BUNDY: And that's not how the law works.

THE COURT: And do you recall following up with her?

MS. BUNDY: I don't remember.

THE COURT: Do you have any recollection of her being followed up, M[s]. Bundy, since you were taking more notes?

M[S]. BUNDY: I don't. But what I do recall is her turning to Juror No. 3, and saying, "Since I've been bowed" —since you—one way or the other, she sort of acted out her scenario and—which I just felt was sort of bizarre and then when she said, "I can't award damages for emotional distress." I don't want that juror. I don't know what he thinks. That's not how we operate. We don't think that people don't get money for emotional distress. We think they ought to show and prove their case. I don't think it's just for cause. I think she could have been rehabilitated, but those two answers, they were in the same ball of time. I mean, they're sort of interrelated, is my memory.

THE COURT: Mr. Valencia?

MR. VALENCIA: Yeah, Your Honor. So there was several other jurors that mentioned they were not comfortable giving money for emotional distress, and Ms. Bundy did not follow up with them. There did not seem to be any concern. I mean, that actually serves the defendant, and I understand why they wouldn't follow up on that. And the other people that did make those statements were not—were not used a peremptory challenge on, and I know that Ms. Bundy did not follow up with her because she only participated once.

2 RP at 426-29.

In short, the city of Yakima justified removal of juror 2 because Yakima's counsel "could not understand" one of her answers that mentioned potential blame on the suing employee. 2 RP at 427. Yakima also justified the peremptory challenge on juror 2's reluctance to award damages for emotional distress. Nevertheless, juror 2 never declared

24

any reticence to award damages for distress. Other venire people voiced a reluctance to award money for emotional distress, but Yakima did not seek their removal.

The trial court sustained Isabel Contreras's GR 37 objection to the city's peremptory challenge on prospective juror 14. The court, however, denied Contreras's GR 37 objection to the peremptory challenge of juror 2. In denying the motion with respect to juror 2, the court reasoned:

> THE COURT: Well, yeah. She was a bit different because she did give an extensive answer, and it was in the context of you asking her questions, and so I note that the circumstances that GR 37(g) requires or—it doesn't require it, it actually says the Court should consider but is not limited to the following—and I do agree with you, Mr. Valencia, in one respect that based on these factors: Ms. Bundy, I don't recall did follow up with her and didn't ask her any questions about that, but I also think that her—she gave enough of a presentation about—she did stand out to me as someone who said that Ms. Contreras—or she suggested that Ms. Contreras or someone in her situation contributed to the situation by being abusive herself.
>
> I almost was wondering myself, like, why that came up for her when you hadn't suggested anything like that in your question. And I—I note there wasn't any questions, again, to follow up with whether there was a basis for cause, but I do—I do see that there was another—or there was—her presentation suggests that, and her answer with regard to the damages for emotional distress, I do see, were concerning. I don't think that—that race or ethnicity, an objective observer looking at that, would—how she responded and the nature of her response would have concluded or thought that the peremptory challenge would have been initiated or had anything to do with race or a factor would have been involved in that. So I'll deny the objection on No. 2.

2 RP at 430-31.  In the end, four of the twelve seated jurors maintained Hispanic surnames.  According to the United States Census Bureau statistics for Yakima County on July 1, 2023, Hispanics constitute fifty-three percent of the county's population.

The jury reached a verdict in favor of the city of Yakima on the claims that survived summary judgment.

LAW AND ANALYSIS

On appeal, Isabel Contreras assigns two errors: the superior court's grant of summary judgment on her claim for wrongful discharge in violation of public policy based on union rights and the court's denial of her GR 37 objection to the city of Yakima's preemptory challenge to juror 2.  Both parties make no distinction between the city of Yakima and its managers, who Contreras sues, for purposes of analyzing liability.  Although our rulings apply to all remaining defendants, we refer to the defendants collectively as the city of Yakima.

The city of Yakima requests that we strike portions of Isabel Contreras's appellate brief.  Yakima argues that a handful of statements in Contreras's opening brief misstate the available evidence or fail to reference parts of the record for support.  We agree that some sentences in Contreras's statement of case either expressly or impliedly misreport the evidence presented by the parties in support of and in opposition to Yakima's summary judgment motion.  We have already addressed some of those misstatements in

our outline of the facts. In rendering our decision, we do not rely on any of Contreras's inaccurate avowals of fact.

### Wrongful Discharge From Employment

Isabel Contreras argues that the trial court erred in granting the city of Yakima's motion for partial summary judgment with respect to her wrongful discharge in violation of public policy claim. She identifies her right to union representation as the public policy. Yakima concedes, for purposes of its summary judgment motion, that union rights qualify as a public policy covered by the tort of wrongful discharge. Yakima argues that no evidence supports union animus as a factor, let alone a substantial factor, in the termination of Contreras's employment.

As a general rule, Washington law limits wrongful discharge in violation of public policy claims to employee firings for four reasons: (1) the employee refused to commit an illegal act, (2) the employee performed a public duty or obligation, such as serving jury duty, (3) the employee exercised a legal right or privilege, such as filing a worker compensation claim; or (4) the employee reported employer misconduct. *Martin v. Gonzaga University*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018). Isabel Contreras's assertion of the right to union representation falls into the third category of exercising a legal right or privilege.

On appeal, Isabel Contreras contends that, for two reasons, union animus constituted a substantial factor behind her wrongful discharge. First, union animus

27

directly impacted the decision to terminate her employment on September 10, 2020.

Second, even if union animus did not motivate her firing on September 10, union animus

motivated the decision to discipline her, on June 12, 2020, for the five California stops.

In turn, because of graduated discipline, city manager Robert Harrison relied in part on

the June suspension when, in September 2020, Harris terminated Contreras for the June

16 violation of policy. The termination letter mentions the earlier discipline. As

Contreras's argument continues, Harris may not have terminated her solely based on her

treatment of Jessica. Thus, Contreras contends she shows a causal connection between

union animus motivating the June 12 suspension and her firing in September even if

union animus did not taint Harrison's decision in September.

We do not address the second of Isabel Contreras's two arguments, because

Contreras did not advance this theory of causation at the superior court level. The

general rule in Washington is that a party's failure to raise an issue at trial waives the

issue on appeal. RAP 2.5(a); *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84

(2011). The purpose of this rule is to ensure the trial court has the opportunity to correct

any errors, thereby avoiding unnecessary appeals. *State v. Calloway*, 31 Wn. App. 2d

405, 423, 550 P.3d 77 (2024), *review granted*, 3 Wn.3d 1031, 559 P.3d 1023 (2024).

The trial court dismissed Isabel Contreras's wrongful discharge cause of action on

summary judgment. Washington law discourages the grant of summary judgment in a

discriminatory discharge case because of the employee's difficulty in proving a

discriminatory motivation. *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017); *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 572, 459 P.3d 371 (2020). To avoid summary judgment, the employee must only show that a reasonable jury could find that discrimination was a substantial factor in the employer's adverse employment action. *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 189 Wn.2d 516, 528 (2017).

Isabel Contreras concedes she forwarded no direct evidence that her assertion of union rights motivated her firing by city manager Robert Harrison. Generally, direct evidence describes what the defendant did and said. *Mission Consolidated ISD v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). Contreras claims, however, that she presented sufficient circumstantial evidence of a union animus. Thus, Contreras insists that she established a prima facie case of wrongful discharge that required a burden shift to the city of Yakima under summary judgment principles. In response, the city of Yakima argues that Contreras provided no direct or circumstantial evidence that city manager Robert Harrison, when terminating Contreras's employment in September 2020, knew of her request for union representation nearly three months earlier before Harrison gained employment with the city. As the argument proceeds, because of Harrison's lack of knowledge, he could not have been motivated by anti-union bias or by Contreras's insistence in bringing a union representative to the May 15 meeting with Jeff Beaver.

Isabel Contreras emphasizes Jeff Beaver's notes regarding the May 15, 2020 meeting with her, which declare:

I told [Contreras] that I was disappointed that she wouldn't speak to me personally and that implies a trust issue and if there is no trust there's no relationship.

CP at 266. Contreras highlights that Beaver, by the time of the May 15 meeting, had already viewed the videos exhibiting her California stops, which, according to Contreras, Beaver had resolved. But as a result of the distrust created by her request to have a union representative attend the meeting, Beaver resolved to discipline Contreras. His disappointment, if not anger, toward Contreras insisting on union assistance motivated him to conduct a second review of the videos for the purpose of disciplining her. Beaver retaliated by imposing a forty-hour suspension. This suspension contributed to her firing months later. But, as the city mentions, Contreras fails to cite to the record for this factual contention.

Isabel Contreras misstates the evidence on which she relies. Jeff Beaver and Yakima Transit continued with the investigation into the May 6 California stops incidents at the time of the May 15 meeting regarding the Sharon incident. Yakima Transit had yet to determine what discipline it would impose because of the California stops. During Beaver's October 20, 2022 deposition, he testified to the separation of the Sharon incident and California stops incidents. Beaver wanted to handle the two situations one at a time.

30

When the employee relies on circumstantial evidence to show a discriminatory intent, Washington law utilizes a three-step evidentiary burden-shifting framework for discriminatory discharge claims announced in federal law. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d 46, 68, 821 P.2d 18 (1991); *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571 (2020). This three-step protocol extends to a retaliation claim. *Laing v. Federal Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013).

First, the employee must establish a prima facie case of wrongful discharge in violation of public policy by showing that both (1) the employer "may have" discharged her for a reason that contravenes a clear mandate of public policy, and (2) that her public-policy-linked conduct was a significant factor in the decision to discharge. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984); *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 577-78 (2020). Stated differently, the plaintiff must tie a causative connection between the alleged adverse action and the protected activity. *Summa v. Hofstra University*, 708 F.3d 115, 125 (2d Cir. 2013). An employee proves causation by showing that retaliation was a substantial factor motivating the adverse employment decision. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 412 (2018). The employee must establish specific and material facts to support this first step in the three-step analysis. *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66, 837 P.2d 618 (1992).

31

If the employee shows a causal connection between the adverse employment decision and her protected activity, the burden shifts to the employer, under step two, who must articulate a legitimate, nondiscriminatory reason for the discharge. *Mikkelsen v. Public Utility District. No. 1 of Kittitas County*, 189 Wn.2d 516, 527 (2017); *Scrivener v. Clark College*, 181 Wn.2d 439, 446, 334 P.3d 541 (2014). The employer must only demonstrate that its evidence, if taken as true, allows a factfinder to recognize a non-discriminatory reason for the discharge. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571-72 (2020). If the employer meets this burden of production, the third step in the framework requires that the employee produce sufficient evidence to establish a question of fact as to whether the employer's alleged nondiscriminatory reason for the adverse employment action was pretextual or that, even if the stated reason was legitimate, discrimination, retaliation, or violation of public policy also was a substantial motivating factor. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 581 (2020); *Scrivener v. Clark College*, 181 Wn.2d 439, 441-42 (2014). Because we conclude that Isabel Contreras failed to show a question of fact to establish a prima facie case, we only address the first part of the three-part test.

Cause in fact usually presents a question for the trier of fact and is generally not susceptible to summary judgment. *Behla v. R.J. Jung, LLC*, 11 Wn. App. 2d 329, 347, 453 P.3d 729 (2019). The plaintiff can survive a motion to dismiss if she presents some competent evidence of factual causation that precludes jury speculation. *Behla v. R.J.*

*Jung, LLC*, 11 Wn. App. 2d 329, 347 (2019). The court may decide cause in fact as a matter of law, however, if the facts and inferences from them are plain and not subject to reasonable doubt or difference of opinion. *Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985).

When the employee claims retaliation for exercising a right, a necessary element to establish a prima facie case for retaliation is the employer's knowledge of the protected conduct of the employee. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 412; *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d 46, 69 (1991). An employer cannot retaliate against an employee for an action of which the employer is unaware. *Marin v. King County*, 194 Wn. App. 795, 818, 378 P.3d 203 (2016); *Anica v. Wal–Mart Stores, Inc.*, 120 Wn. App. 481, 84 P.3d 481 (2004). As a corollary to the proof of employer knowledge, the plaintiff must show that the employer's agent who decided to impose the adverse employment action knew of the protected activity. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 414 (2018).

In *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403 (2018), the state Supreme Court stretched this knowledge requisite to include a decision maker's suspicion that the employee engaged in protected activity. We still consider suspicion to entail actual knowledge in the sense that the decision maker possesses actual knowledge of certain facts that lead to the suspicion.

33

In recognition of the difficulty of proving not only motive but also knowledge, the employee may show knowledge by circumstantial evidence, since only a rare employer announces retaliation as its motive. *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d 46, 69 (1991). That awareness, like most issues of fact, can be established through circumstantial evidence—but not by unsupported inference. *Martin v. Financial Asset Management Systems, Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). Stated differently, a finding that a decision maker was aware of an employee's protected conduct must be supported by reasonable inferences from the evidence, not mere speculation. *Martin v. Financial Asset Management Systems, Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020).

We venture forward to assess whether Isabel Contreras presented sufficient circumstantial evidence of city manager Robert Harrison's knowledge of her exercising union rights when Harrison fired Contreras. In doing so, we review both Washington and federal cases that entail an employee suing for wrongful discharge in retaliation for reporting employment discrimination. Washington courts consistently review federal case law interpreting federal discrimination statutes to aid in the interpretation of Washington's law addressing an employee's retaliation cause of action. *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 491, 325 P.3d 193 (2014). The Washington Supreme Court has frequently recognized that, while federal discrimination cases are not binding, they may be persuasive and their analyses adopted when they further the purposes and

mandates of state law. *Antonius v. King County*, 153 Wn.2d 256, 266, 103 P.3d 729 (2004).

This appeal, at least as far as our record is concerned, oddly contains no declaration or deposition testimony from city manager Robert Harrison that he lacked any knowledge of Isabel Contreras bringing a union representative to the May 15 meeting with Jeff Beaver or of Beaver drawing ire because of the presence of the union steward. The city of Yakima does not expressly deny that Harrison lacked any knowledge. Instead, the city argues that Contreras has presented no evidence of Harrison's knowledge.

Employees have asserted shrewd and sensible arguments in order to either establish a question of fact as to the decision maker's knowledge or to skirt the requirement of knowledge. Isabel Contreras argues that she created a question of fact because: (1) the proximity of her May 14, 2020 demand for union representation and her firing on September 10; (2) her employment file must have contained Jeff Beaver's May 15 meeting memorandum and Robert Harrison must have reviewed Contreras's entire file before deciding to fire her; (3) Harrison must have been encouraged directly or indirectly by Beaver to fire Contreras; (4) Contreras need not show knowledge in Harrison because the law charges the city of Yakima with knowledge held by any of its employees, including Beaver; and (5) Yakima Transit treated other workers differently.

Isabel Contreras maintains that her firing only three months after she asserted union representative rights raises a presumption that her protected activity contributed to her termination. The employee may establish a causal connection needed for proof of a retaliation claim by indirectly showing that the protected activity followed close in time to the adverse action. *Clark County School District v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); *Cifra v. General Electric Co.*, 252 F.3d 205, 217 (2d Cir. 2001); *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 415-16 (2018). Absent other facts, temporal proximity between an employer's knowledge of a protected activity and an adverse employment action must be "very close" to establish the causation prong. *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001).

Courts disagree as to the proximity in time needed for the presumption of causation and the decision maker's knowledge. This court allowed the jury to infer causation when twelve days passed between the protected activity and the employment termination. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557 (2020). Other courts have assessed three months as sufficiently long to break any causal connection. *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111 (4th Cir. 2021); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir.1990). In a federal decision, a lapse of two months between the protected activity and the adverse action significantly weakened the inference of causation. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

One federal circuit court of appeals recognized that a court must exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Courts extend the time between the protected activity and the firing, for purposes of the presumption of retaliation, for fear that a clever employment manager, with knowledge of employment law, might wait months before retaliating so that a trier of fact will be fooled as to the motivation behind an adverse employment decision. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

We refuse to apply any presumption in this appeal because the decision maker did not work for the city of Yakima at the time of Isabel Contreras's protected activity. Because of his lack of employment in June 2020, Robert Harrison would not have abided his time to fire Contreras in September 2020 so that a trier of fact would be fooled into concluding that sufficient time had passed to sever any causal relationship. Also, although some courts have applied the presumption of retaliation even with the passage of three months, most courts do not.

Isabel Contreras insists that Robert Harrison must have seen Jeff Beaver's May 15 meeting memorandum and that Beaver must have encouraged either Harrison or another Yakima Transit manager to fire her. This emphasis unknowingly employs the cat's paw doctrine that imputes the bias of the employee's supervisor to the employer's decision maker. Based on a fable from the 1600s, the cat's paw theory declares that an employer

can be liable for the discriminatory acts of a biased supervisor when that supervisor influenced the unbiased employment decision maker. *Henry v. Wyeth Pharmaceuticals., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010). In the fable "The Monkey and the Cat," written by Jean de La Fontaine, a cunning monkey persuades a naïve cat to retrieve chestnuts from a fire, with the cat ultimately burning its paws while the monkey enjoys the chestnuts. The United States Supreme Court, in *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d144 (2011), bestowed the fable's name on the doctrine. In Contreras's view, Beaver plays the role of the monkey to Harrison's cat.

In the employment context, the employee, to succeed under the cat's paw theory, must produce evidence that his supervisor, being motivated by a retaliatory animus, took acts intended to cause an adverse employment action and those acts influenced the decision maker to fire the employee. *Zamora v. City of Houston*, 798 F.3d 326, 333 (5th Cir. 2015); *McClusky v. City of North Bend*, 332 Or. App. 1, 20-22, 549 P.3d 557, *review denied*, 372 Or. 812, 558 P.3d 850 (2024). The cat's paw argument requires evidence that the ultimate and manipulated decision maker—the puppet—followed the biased recommendation of another—the puppeteer—without independently investigating the complaint against the employee. *Harris v. Public Health Trust of Miami-Dade County*, 82 F.4th 1296, 1301 (11th Cir. 2023).

Isabel Contreras presents no evidence that Jeff Beaver wanted her fired, no evidence that Beaver, either directly or indirectly communicated information about

38

Contreras to Robert Harrison, and no evidence that any such evidence influenced the decision of Harrison.

Isabel Contreras does not dispute she failed to stop at five stop signs. She does not dispute her poor treatment of Jessica. She does not dispute that the failure to stop violated the traffic laws and the Yakima Transit policy manual. She does not dispute that starting the bus before Jessica sat down violated the policy manual and endangered the safety of Jessica and perhaps Jessica's child. She does not argue against the policy manual permitting termination of employment for her rule violations.

Isabel Contreras argues that any lack of knowledge in Robert Harrison does not defeat her wrongful discharge claim. She contends that the city of Yakima, as a corporation, can only act through its agents and whatever one agent knows all employees of the corporation know. The Washington Supreme Court avoided addressing this general corporate knowledge standard in *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403 (2018). Contreras forwards no decision that adopts the general corporation knowledge rule. Most courts reject the standard and demand proof that the decision maker possessed knowledge. *District of Columbia v. Bryant*, 307 A.3d 443 (D.C. 2024), *reh'g denied* (Sept. 27, 2024); *Roberts v. Glenn Industries Group, Inc.*, 998 F.3d 111, 125 (4th Cir. 2021); *Raney v. Vinson Guard Services, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *Marin v. King County*, 194 Wn. App. 795, 813 (2016). One federal circuit court of appeals noted that corporate knowledge may suffice for a direct claim of

39

discrimination, but not a cause of action for retaliation for protected activity. *Roberts v. Glenn Industries Group, Inc.*, 998 F.3d 111, 125 (4th Cir. 2021).

We do not find Isabel Contreras's contention that Yakima Transit treated her differently from others who violated employment rules persuasive. All of her forwarded comparable employees violated a rule only once. Contreras received the same discipline as other workers the first time she violated a rule. She received a written reprimand when she failed to stop at a stop sign in 2017. But she continued to violate safety laws and rules thereafter. She failed to stop at five stop signs in May 2020. She was not fired even then. Within four days of the announcement of her suspension, she violated the rule of moving the bus without all passengers being seated.

The law allows an employee to prove a pretext by identifying disparate treatment of other employees. The appropriate comparators are employees similarly situated to the plaintiff and doing substantially the same work as the plaintiff. *Litvack v. University of Washington*, 30 Wn. App. 2d 825, 846, 546 P.3d 1068 (2024); *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 54, 573 P.2d 389 (1978). The employees to be compared must be similarly-situated in all respects, meaning they must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Smith v. Stow*, 2023-Ohio-4302, 229

N.E.3d 1265, 1270. None of Isabel Contreras's comparables committed more than one violation.

We now outline three decisions that help to explain the law and help us to measure whether Isabel Contreras presented sufficient evidence of knowledge to defeat a summary judgment motion. We begin with *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111 (4th Cir. 2021). The United States Circuit Court of Appeals affirmed a summary judgment dismissal of an employee's claim that his employer retaliated against him because of his reporting of sexual harassment. The employer's Chief Executive Officer, Richard Glenn, fired Chazz Roberts purportedly because Roberts violated safety rules. Roberts presented no facts that he faced a pattern of sexual harassment over months, if not years, while on the job. Roberts had complained two months before the termination to the company's human resources manager who also moonlighted as the wife of Richard Glenn. The United States Circuit Court of Appeals concluded that Glenn lacked actual knowledge of Roberts' complaints of sexual harassment when he terminated him. Also, a three-month passage of time did not constitute a temporal proximity between Roberts' last complaint and his termination. Roberts argued to no avail that Glenn possessed constructive knowledge of his complaints because Roberts complained to the company's human resources manager, who was Glenn's spouse. The appeals court held firm to the rule that the decision maker must have actual knowledge of

41

the protected activity. By definition, the decision maker cannot fire someone because of a factor of which he is unaware. Knowledge of other employees lacks any bearing.

Richard Glenn denied any knowledge of the sexual harassment. Chazz Roberts acknowledged he never complained to Glenn about the harassment despite speaking to him twice. Roberts presented no evidence that those to whom he complained reported the allegations to Glenn. Roberts forwarded no evidence of anyone's behavior or comments from which a trier of fact could conclude that Glenn knew of the sexual harassment complaints.

Isabel Contreras presents no evidence of behavior or utterances of anyone from which a trier of fact could reasonably infer that Robert Harrison knew of Contreras bringing a union representative to the May 15 meeting. The man with the supposed union bias, Jeff Beaver, worked three levels of hierarchy below city manager Harrison. Beaver played no role in responding to the complaint of Jessica, other than creating a report for the complaint and submitting it to his supervisor.

In *District of Columbia v. Bryant*, 307 A.3d 443 (D.C. 2024), Tyrone Bryant, a former employee of the city's Department of Youth Rehabilitation Services, sued the city for wrongful discharge. Bryant asserted that the city terminated his employment after he communicated his intent to testify against the city in a harassment suit filed by a colleague. A jury rendered a verdict on behalf of Bryant, which verdict the appeals court affirmed. The director of the department, Vincent Schiraldi, terminated Bryant's

employment. On appeal, the city contended that Bryant could not sustain his claim of retaliation because he presented no evidence of the decision maker's knowledge of his protected activity. Schiraldi denied such knowledge. The appeals court noted other evidence that showed that Bryant told the city's lawyers and his supervisor, Deputy Superintendent David Thomas, in the presence of Superintendent Dexter Dunbar of his intentions to testify to the truth. Dunbar recommended Bryant's termination to Chief of Committed Services David Muhammad. Muhammad forwarded the recommendation to Schiraldi. According to the reviewing court, this direct chain of conversation to Schiraldi sufficed to present a question of fact as to whether Schiraldi knew of the protected activity.

Isabel Contreras might argue that, as a new city manager, Robert Harrison might rely more heavily on recommendations from Contreras's supervisors or on Contreras's employee file, which could contain Jeff Beaver's May 2020 memo complaining about Contreras insisting on the presence of a union representative at the May 15 meeting. Contreras might argue that, because of the gravity of terminating an employee's employment, Harrison took the same measures as consulting with others and reviewing the file. In fact, Contreras argues that Harrison must have reviewed all documents in Contreras's employment file and those notes must have included Beaver's May 15, 2020 memorandum. But, Contreras presented no direct evidence of Harrison's knowledge of

her protected activity. Contreras could have unearthed such evidence during discovery, if any of the evidence existed.

Isabel Contreras presented no evidence of a direct chain of conversation beginning with Jeff Beaver and ending with Robert Harrison. Contreras presented no evidence that Beaver recommended the termination of her employment. Although Alvie Maxey would have recommended Contreras's firing, he never gave a recommendation to Harrison. No evidence implied that Harrison consulted with anyone about terminating Contreras's employment.

Many employees subjected to retaliation produce an employment file that shows the employee to receive good performance evaluations. Isabel Contreras did not do so.

*Martin v. Financial Asset Management Systems, Inc.*, 959 F.3d 1048 (11th Cir. 2020) may be the decision most parallel to our appeal. Melinda Martin gained employment at Financial Asset Management Systems, Inc., a debt-collection agency, as an operations manager in 2009. Throughout her tenure, Martin was supervised by the company's President and CEO, Jerry Hogan, who promoted her to Director of Operations in 2010.

In October 2012, Melinda Martin filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that Jerry Hogan and the company discriminated against her based on race and sex. Martin alleged that Hogan screamed profanities, kicked chairs, threw bottles, and banged tables during her feedback sessions.

She contended that Hogan did not treat her white male coworkers in the same manner. In December 2012, Martin, Hogan, and the debt collection agency settled the charges at mediation.

On February 26, 2014, Melinda Martin participated in an executive staff meeting with Jerry Hogan and some colleagues. During the meeting, according to Martin, Hogan screamed, yelled, and belittled her in front of her peers for the thousandth time in reference to nothing. Martin left the meeting crying. She emailed the company's vice-president of human resources, Lida Bayne, asking to talk.

Around the same time, Jerry Hogan repeatedly called Melinda Martin's office to discuss what had happened during the executive staff meeting. Despite being in her office, Martin did not answer the calls. Soon after, Lida Bayne arrived at Martin's office, at which point Martin announced that that she wanted to file a complaint against Hogan. According to Martin, she told Bayne that Hogan targeted her as a Black female and that Hogan treats white male subordinates, including those with poor work performance, better. According to Bayne, Martin complained about treatment from Hogan, but did not mention race or gender discrimination. The two ended the meeting with Martin stating she needed some days off work.

Lida Bayne emailed Jerry Hogan the next day to inform him that Melinda Martin had spoken to her and that Martin intended to take time off work to care for herself. Bayne added that a visibly shaken Martin expressed frustration about being targeted for

criticism. Either that same day or the next, Bayne met with Hogan in person to discuss Martin. According to Bayne, Hogan vented his ongoing frustration with Martin. Both Bayne and Hogan denied that Bayne informed Hogan that Martin alleged race or sex discrimination. Hogan decided, during the meeting, to fire Martin for refusing to answer his calls following their executive staff meeting. Two days later, Hogan signed a termination letter and mailed it to Martin.

The federal district court dismissed on summary judgment Melinda Martin's case for retaliation under Title VII. The court concluded that Martin failed to establish a prima facie case because Martin lacked any evidence that Jerry Hogan knew that Martin claimed race or gender discrimination. The circuit court of appeals affirmed. The reviewing court noted that it must assume Martin's testimony—that she complained to Lida Bayne about race and sex discrimination—to be true. Still, no evidence showed that Bayne told Hogan about the specific complaint. The court would not presume that, if Martin complained about gender and race discrimination, Bayne must have informed Hogan of the nature of the complaint.

On appeal, Melinda Martin countered that Jerry Hogan must have known because Hogan fired her two days after she spoke to Lida Bayne. The circuit court of appeals noted that an employee's termination within days of her protected activity can be circumstantial evidence of a causal connection between the two. But that presumption did not apply with unrebutted evidence that the decision maker lacked knowledge. Based

on Bayne's and Hogan's testimony, a trier of fact would need to speculate whether

Hogan possessed knowledge.

The *Martin* court accepted Melinda Martin's argument that she could defeat a

summary judgment motion with circumstantial evidence of knowledge, despite Jerry

Hogan's denial. The court reviewed in detail the evidence forwarded by Martin. Martin

emphasized that the company's employee handbook required notifying alleged

perpetrators of discrimination complaints. Nevertheless, the handbook required

complaints to be in a writing signed by the complainant.

Melinda Martin next highlighted that Jerry Hogan knew that she filed an EEOC

complaint in 2012 about race discrimination such that Hogan must have concluded that

her new complaint also alleged race discrimination. The court answered that a bare

suspicion that Hogan may have guessed about Martin's claim did not suffice.

Melinda Martin next underscored that, even if Lida Bayne did not directly mention

discrimination, she may have uttered other words that placed Jerry Hogan on notice of an

allegation of race or sex discrimination. The court answered that drawing such a

conclusion would be speculation.

Melinda Martin contended that a grant of summary judgment to the employer

required an impermissible credibility determination. The court disagreed. If Lida Bayne

or Martin respectively testified that that Bayne informed Jerry Hogan of the nature of the

charges, but Hogan denied being informed, the court could not render a credibility

assessment. The court accepted Martin's testimony that she told Bayne of being the target because of her race or sex, despite Bayne's denial. But no percipient witness testified that Hogan possessed knowledge. In the end, the reviewing court agreed with the district court that Martin's lack of circumstantial evidence other than temporal proximity meant a reasonable jury could not infer, rather than guess or assume, knowledge. Evidence that Bayne could have told Hogan about the nature of Martin's complaints did not equate to Bayne actually telling him.

Finally, Melinda Martin maintained that the district court could not grant summary judgment based on a defendant's testimony. The court responded that a jury could disbelieve Jerry Hogan's testimony, but that confused the point. Hogan carried no burden to disprove knowledge. Martin, as the plaintiff, carried the burden to present some evidence of knowledge.

The *Martin* court's reasoning that a suspicion by Jerry Hogan that Melinda Martin's latest complaint entailed race discrimination because of the earlier charge may conflict with the Washington Supreme Court's ruling, in *Cornwell v. Microsoft Corporation*, that suspicion of the filing of a protest about protected activity suffices to present a prima facie case. But Isabel Contreras had not previously filed a union retaliation claim with the city of Yakima. Contreras does not rely on the suspicion rule.

To repeat, our record shows no express declaration from city manager Robert Harrison that he denies knowledge of Isabel Contreras's union activity. Instead the city

of Yakima argues that Contreras lacked evidence of knowledge or suspicion of union activity. In this sense, this appeal differs from *Roberts v. Glenn Industrial Group* and *Martin v. Financial Asset Management Systems, Inc.* We determine, however, that this difference does not change the outcome.

We apply the knowledge requisite to affirm the summary judgment dismissal because the defending party may bring a summary judgment motion without relying on any affirmative facts and instead require the complainant to forward facts supporting its claim. CR 56(b) declares:

> For Defending Party. A party against whom a claim, counterclaim, or cross claim is asserted or a declaratory judgment is sought may move with or without supporting affidavits for a summary judgment in such party's favor as to all or any part thereof.

The defendant can attempt to establish through affidavits that no material factual issue exists or, alternatively, the defendant can inform the trial court that the plaintiff lacks competent evidence to support an essential element of her case. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989); *Boyer v. Morimoto*, 10 Wn. App. 2d 506, 519, 449 P.3d 285 (2019). Thus, the moving party need not support its summary judgment motion with affidavits. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225 n.1 (1989).

Preemptory Juror Challenge

Isabel Contreras claims that the city of Yakima violated GR 37 when removing

Latinx juror 2 with a preemptory challenge. Contreras faults the city for failing to

articulate an objective and rational reason for the removal. We agree.

During jury selection, a party exercises peremptory challenges, striking jurors for

no stated reason, to winnow jurors believed best for his or her case. *State v. Lahman*, 17

Wn. App. 2d 925, 930-32, 488 P.3d 881 (2021). The law affords a party peremptory

challenges as a privilege, not a right. *State v. Lahman*, 17 Wn. App. 2d 925, 938 (2021).

Not surprisingly, reliance on instincts to render judgment about other people's thought

processes and beliefs has historically opened the door to implicit and explicit bias in jury

selection. *State v. Orozco*, 19 Wn. App. 2d 367, 373, 496 P.3d 1215 (2021). The law

assigns a judge an important role in precluding use of peremptory challenges in a

discriminatory manner. *Snyder v. Louisiana*, 552 U.S. 472, 487, 128 S. Ct. 1203, 170 L.

Ed. 2d 175 (2008) (Justice Thomas and Justice Scalia Dissent); *United States v. Vasquez-*

*Lopez*, 22 F.3d 900, 902 (9th Cir. 1994).

As noted in our analysis of Isabel Contreras's wrongful discharge cause of action,

a party faces significant obstacles in proving a discriminatory purpose. The peremptory

challenger may mask the challenge's true purpose by identifying innocuous reasons for

the challenge. Most Americans condemn overt acts of racism, yet the plague of racism

persists through negative stereotypes and assumptions that operate on a subconscious

level and lead people to make discriminatory decisions without any purposeful plan or

deliberation. *State v. Saintcalle*, 178 Wn.2d 34, 53, 309 P.3d 326 (2013) (plurality

opinion), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d 721, 398

P.3d 1124 (2017).

To end implicit bias in jury selection, the Washington Supreme Court, in 2018,

adopted GR 37. *State v. Tesfasilasye*, 200 Wn.2d 345, 347, 518 P.3d 193 (2022). A

party typically invokes GR 37 in a criminal prosecution, but the rule also applies to civil

suits. The rule applies to all jury trials. GR 37(b).

GR 37 declares in pertinent part:

> (a) Policy and Purpose. The purpose of this rule is to eliminate the
> unfair exclusion of potential jurors based on race or ethnicity.
> (b) Scope. This rule applies in all jury trials.
> . . . .
> (e) Determination. The court shall then evaluate the reasons given to
> justify the peremptory challenge in light of the totality of circumstances. If
> the court determines that an objective observer could view race or ethnicity
> as a factor in the use of the peremptory challenge, then the peremptory
> challenge shall be denied. The court need not find purposeful
> discrimination to deny the peremptory challenge. The court should explain
> its ruling on the record.
> (f) Nature of Observer. For purposes of this rule, an objective
> observer is aware that implicit, institutional, and unconscious biases, in
> addition to purposeful discrimination, have resulted in the unfair exclusion
> of potential jurors in Washington State.
> (g) Circumstances Considered. In making its determination, the
> circumstances the court should consider include, but are not limited to, the
> following:
> (i) the number and types of questions posed to the prospective juror,
> which may include consideration of *whether the party exercising the*

> *peremptory challenge failed to question the prospective juror about the alleged concern* or the types of questions asked about it;
>
> . . . .
>
> *(iv) whether a reason might be disproportionately associated with a race or ethnicity;* and
>
> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

(Emphasis added.)

GR 37 restricts a party's ability to remove prospective jurors from a jury panel without cause. *State v. Lahman*, 17 Wn. App. 2d 925, 928 (2021). The rule seeks to reduce racial discrimination in jury selection by focusing on the danger of implicit bias. *State v. Lahman*, 17 Wn. App. 2d 925, 928 (2021). Under GR 37, a judge must deny a party's attempt to remove a juror without cause, a peremptory challenge, if an objective observer *could* view race or ethnicity as *a* factor in the attempted removal. *State v. Lahman*, 17 Wn. App. 2d 925, 928 (2021). Under the terms of the rule, an objective observer must be deemed aware of implicit, institutional, and unconscious bias, in addition to purposeful discrimination. *State v. Lahman*, 17 Wn. App. 2d 925, 928 (2021).

GR 37 concerns itself with possibilities, not actualities, of discrimination. *State v. Lahman*, 17 Wn. App. 2d 925, 938 (2021). This standard of "could view" leads to the denial of more peremptory challenges than a standard of "would view." *State v. Tesfasilasye*, 200 Wn.2d 345, 357 (2022).

52

GR 37 recognizes the trial process must be free from the appearance of discrimination, regardless of actual motives or intent. *State v. Lahman*, 17 Wn. App. 2d 925, 938 (2021). GR 37 teaches that peremptory strikes exercised against prospective jurors who appear to be members of racial or ethnic minority groups must be treated with skepticism and considerable caution. *State v. Lahman*, 17 Wn. App. 2d 925, 938 (2021).

GR 37 furnishes a guided process for assessing the issue of bias within peremptory challenges. *State v. Lahman*, 17 Wn. App. 2d 925, 934 (2021). The rule lists five nonexclusive circumstances relevant to assessing the nature of a peremptory challenge. GR 37(g); *State v. Lahman*, 17 Wn. App. 2d 925 (2021). The rule also specifies seven presumptively invalid justifications for peremptory challenges. GR 37(h); *State v. Lahman*, 17 Wn. App. 2d 925, 934 (2021). These justifications are disproportionately associated with race or ethnicity. GR 37(g)(iv); *State v. Lahman*, 17 Wn. App. 2d 925, 936 (2021). A party may not combine a race-neutral explanation with a presumptively invalid rationalization to remove a juror. *State v. Orozco*, 19 Wn. App. 2d 367 (2021).

We now review Washington decisions applying GR 37. In *State v. Lahman*, 17 Wn. App. 2d 925 (2021), the State prosecuted Travis Lahman for kidnapping and assault of his girlfriend. The State exercised a peremptory challenge on an Asian venireman and justified the exclusion on the lack of experience of the young man. This court held the exercise of the peremptory challenge to violate GR 37. Research shows that a common stereotype of Asian Americans is that they are strong in academics, to the detriment of

53

interpersonal skills. The State did little to explain why the juror's age prevented him from service and instead opened the possibility that the prosecution implicitly and unsuitably relied on a stereotype that an Asian American lacked the frame of mind to side with the State. We did not conclude that the prosecutor's decision to strike the juror resulted from purposeful, let alone improper, discrimination. We emphasized that the Supreme Court wrote GR 37 in terms of possibilities, not actualities. The rule recognizes the trial process must be free from the appearance of discrimination, regardless of actual motives or intent.

We compare and contrast *State v. Lahman* to Isabel Contreras's appeal. Contreras's jury, like Travis Lahman's jury, contained other minorities. The prosecutor of Lahman asked the challenged juror few questions. At Contreras's trial, Yakima's counsel asked prospective juror Juanita Ortiz no questions, let alone questions pertaining to Yakima's excuse for excusing the juror.

In *State v. Orozco*, 19 Wn. App. 2d 367 (2021), this court reversed a conviction for murder, among other convictions. We held that the State's peremptory challenge not only violated GR 37 but a narrower constitutional rule emanating from United States Supreme Court's landmark decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Juror 25, removed by a peremptory challenge, was the only African-American in the jury pool. Juror 25 indicated she could be fair to both sides. The State did not ask any questions of her. After a defense challenge to the removal of

54

juror 25, the State justified the removal because its counsel had prosecuted her in the past and she appeared in police reports as associating with others engaged in crimes.

On review, this court recognized that the prosecutor having prosecuted the juror constituted a racially neutral reason. But the State added the invalid justifications of juror 25 having earlier police contact and appearing in police reports as associating with criminals. The latter two motivations fell on the list of reasons historically associated with racial discrimination. This court resolved that combining a race-neutral explanation with a presumptively invalid rationalization crossed the line into forbidden territory. An objective observer could view race as a factor in the use of the peremptory strike.

We compare our trial's voir dire with the voir dire in *State v. Orozco*. The prosecution in *Orozco* did not ask juror 25 questions. To repeat, the city of Yakima, in Contreras's suit, also asked juror 2 no questions. Juror 25 stated she could be fair to both sides. The city of Yakima never asked juror 2 about her ability to be fair to both sides.

In *State v. Tesfasilasye*, 200 Wn.2d 345 (2022), a jury found Amanuel Tesfasilayse, a Black Eritrean immigrant who worked as a driver for people with disabilities, guilty of sexually assaulting a visually impaired woman. In a juror questionnaire, juror 25, an Asian woman, questioned whether she could be fair. During voir dire, she revealed that she had been sexually assaulted as a child. She also disclosed that the State prosecuted her son for allegedly placing a young girl's hand on his groin.

At the advice of counsel, the son pled guilty, although he was innocent according to his mother. She stated she worked in a nursing home as a sexual assault investigator and understood that allegations of sexual assault were common in caregiver settings. Finally, juror 25 indicated she would separate her personal experiences from the facts of the case, and, contrary to her questionnaire answer, she could be fair to both parties.

In *State v. Tesfasilasye*, the State exercised a peremptory challenge on juror 25. In face of a GR 37 objection from Amanuel Tesfasilayse, the State emphasized the juror's son's sexual assault conviction. The trial court permitted the peremptory challenge because the juror stated she believed her son to be treated unfairly. The trial court concluded that the juror was "not a believer in the [judicial] system." The trial court also noted that another Asian juror sat in the panel. The Washington high court reversed the conviction in light of the denial of Tesfasilayse's GR 37 objection. The Supreme Court deemed juror 25 uniquely qualified to empathize with both the accused and the complaining witness. The court emphasized that, under GR 37, excusing a juror for a close relationship with someone previously arrested, charged, or convicted of a crime was presumptively invalid.

We compare Isabel Contreras's appeal with *State v. Tesfasilasye*. Juror 25, in *Tesfasilasye*, despite a contrary questionnaire answer, repeatedly claimed during voir dire the ability to be fair to both sides. Her background provided reasons to side with both the State and the accused. The State justified removal because of the son's previous

56

connection to the judicial system. To repeat, the city of Yakima did not inquire about juror 2's ability to sit as a fair juror in Isabel Contreras's case. The fact that other Hispanics sat on the jury did not validate Yakima's preemptory challenge.

In *State v. Hale*, 28 Wn. App. 2d 619, 537 P.3d 707 (2023), *review denied*, 544 P.3d 31 (2024), this court rejected an appeal based on GR 37. The prospective juror removed by a preemptory challenge was possibly Hispanic. The juror worked in child protection. The State asked other jurors about work experience, and some answered they held employment in child protection and victim advocacy. In the case on appeal, the city of Yakima did not remove other potential jurors who expressed hesitancy to award money for emotional distress.

The city of Yakima justified removal of juror 2 because one answer addressed blame and fault of an employee suing for a high sum. Yakima's counsel insisted that she "could not understand" the answer. 2 RP at 427. On appeal, the city now states that, after juror 2 talked at length, its counsel understood the answer. But when justifying the preemptory challenge before the superior court, defense counsel continued to insist the answer was unintelligible. If counsel could not understand the answer, she could have and should have asked juror 2 to explain the answer. GR 37 deems inappropriate a challenge to a juror when the party exercising the challenge fails to ask the prospective juror about the alleged concern.

Yakima also justified the preemptory challenge on juror 2's reluctance to award damages for emotional distress. Nevertheless, juror 2 never declared any reticence to award damages for distress. She suggested that someone who asks for millions of dollars may have reciprocally abused coworkers or managers. Unlike juror 2, other jurors expressed a hesitancy to award money for emotional distress. The city of Yakima did not challenge these other jurors.

Yakima justified the removal of juror 2 on a desire for jurors to be fair to both parties and a wish for jurors to be attached to reality and to be reasonable. This rationalization implicates Latinx stereotypes. In this appeal, Yakima characterizes juror 2's answers as "odd." Br. of Resp't at 36. Stereotypes harmful to Latinx include having a limited education and possessing an inability to speak intelligently. *Latino Stereotypes that Need to Go Away Already!*, https://hiplatina.com/latino-stereotypes-debunked.

We perform de novo review of trial court's decisions under GR 37. *State v. Jefferson*, 192 Wn.2d 225, 2450 429 P.3d 467 (2018) (plurality opinion); *State v. Listoe*, 15 Wn. App. 2d 308, 321, 475 P.3d 534 (2020). When considering whether an objective observer could view race or ethnicity as a factor, a reviewing court stands in the same position as does the trial court. *State v. Jefferson*, 192 Wn.2d 225, 250 (2018). We need not be convinced by a probability that implicit bias occurred, only that an objective observer *could* view race or ethnicity as *a* factor in the attempted removal. Because the Constitution forbids striking even a single prospective juror for a discriminatory purpose,

allowing a party to dismiss a juror for reasons of race or ethnicity requires reversal and

remand for a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 486, 128 S. Ct. 1203, 170 L.

Ed. 2d 175 (2008); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994).

This remedy applies regardless of the strength of the opposing party's case. *State v.*

*Lahman*, 17 Wn. App. 2d 925, 932 (2021). In another case involving racial prejudice

infecting voir dire, the Washington Supreme Court adopted an automatic reversal

standard. *State v. Zamora*, 199 Wn.2d 698, 722, 512 P.3d 512 (2022).

Attorney Fees

Isabel Contreras argues for an award of attorney fees on appeal pursuant to RAP

18.1 and RCW 49.48.030. RAP 18.1(a) provides:

> If applicable law grants to a party the right to recover reasonable
> attorney fees or expenses on review before either the Court of Appeals or
> Supreme Court, the party must request the fees or expenses as provided in
> this rule, unless a statute specifies that the request is to be directed to the
> trial court.

Under RCW 49.48.030,

> [i]n any action in which any person is successful in recovering
> judgment for wages or salary owed to him or her, reasonable attorney[]
> fees, in an amount to be determined by the court, shall be assessed against
> said employer or former employer: PROVIDED, HOWEVER, That this
> section shall not apply if the amount of recovery is less than or equal to the
> amount admitted by the employer to be owing for said wages or salary.

We reverse the jury verdict in favor of the city of Yakima on Isabel Contreras's

causes of action other than wrongful discharge in violation of public policy. We remand

for a new trial, but Contreras has yet to be successful in procuring a judgment.

Therefore, we deny Contreras an award of attorney fees at this time.

CONCLUSION

We reverse the jury verdict, but not the summary judgment dismissal of Isabel

Contreras's cause of action for wrongful discharge resulting from her exercise of union

rights. We remand for a new trial on the other causes of action.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.